## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

SURVIVOR, by and through his next
friend, CAROLYN SALISBURY, Executive Director
of Lawyers for Children America Florida Office.

                           Plaintiff,                            CASE NO:

vs.

OUR KIDS OF MIAMI-DADE/MONROE, INC.;
THE CENTER FOR FAMILY AND CHILD
ENRICHMENT, INC.; JEAN LACROIX, individually;
EUNICE GUILLOT, individually; LACHERYL HARRIS
f/k/a LACHERYL ALVARADO, individually; ALICIA
PROFF, individually; LATEEF IBRAHIM, individually;
ANGELA WILLIAMS, individually; ROBERTA THEOC,
individually; and YVES FRANCOIS, individually

                          Defendants.

_____/

## COMPLAINT

Plaintiff, SURVIVOR, a minor child, by and through his next friend, CAROLYN SALISBURY, Executive Director of Lawyers for Children America Florida Office, by and through undersigned counsel, sues Defendants OUR KIDS OF MIAMI-DADE/MONROE, INC.; THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC.; JEAN LACROIX, individually; EUNICE GUILLOT, individually; LACHERYL HARRIS f/k/a LACHERYL ALVARADO, individually; ALICIA PROFF, individually; LATEEF IBRAHIM, individually; ANGELA WILLIAMS, individually; ROBERTA THEOC, individually; and YVES FRANCOIS, individually, and in support thereof state as follows:

## PRELIMINARY ALLEGATIONS

1.     This action arises under and is brought pursuant to 42 U.S.C §1983 to remedy the

deprivation under color of state law, of rights guaranteed by the Fourteenth Amendment to the United States Constitution.

2.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1343, as an action brought pursuant to 42 U.S.C. §1983 and 28 U.S.C. §1331, as an action brought pursuant to the Constitution and the laws of the United States.

3.   This Court has pendent jurisdiction over Plaintiff's claims arising under the laws of the State of Florida pursuant to 28 U.S.C. §1367.

4.   This cause of action arose in the Southern District of Florida, so venue is proper under 28 U.S.C. §1391(b).

5.   This case is brought by and on behalf of Plaintiff, SURVIVOR, (hereinafter "SURVIVOR") a foster child who was taken into custody along with his sister, Victim, by the Florida Department of Children and Family Services (hereinafter "DCF") in 2004 at nearly four (4) years old and placed in the home of Abusive Mother and Abusive Father (hereinafter "Abusive Parents"), where they suffered years of abuse and neglect as foster children and then as the adopted children of the Abusive Parents.  Their horrific story ends when the authorities found Victim murdered by Abusive Parents and SURVIVOR severely injured and near death himself. SURVIVOR has filed this action using pseudonyms to protect his anonymity based upon the circumstances described below, and his name and the name of the Abusive Parents will be supplied to the Defendants under separate cover.

6.   This case confirms the unconstitutional system of care established by OUR KIDS OF MIAMI-DADE/MONROE, INC., (hereinafter "OUR KIDS"), the lead community-based care agency, who assumed responsibility for the provision of foster care and related services from DCF pursuant to the State of Florida's outsourcing of foster care in 2005.

7.      OUR KIDS has created a system of care that could not ensure the safety and well-being of all foster children like SURVIVOR.  It has abdicated its constitutional and statutory duties to ensure each child in its care is free from harm by delegating all responsibility for children in its care and custody to its subcontractors with no direct supervision of the cases, no participation in case staffings, and no other individual case involvement that would be necessary to meeting its constitutional and statutory duties, resulting in a child welfare system that permits case managers to operate unchecked and unsupervised, and blatantly ignore and/or deliberately fail to learn of the dangers and warning signs that in this particular case should have alerted anyone and everyone paying the minimal attention that SURVIVOR was in danger and being subjected to abuse and neglect in the Abusive Parents' home.

8.      This horrific case represents a series of gross departures from the standard of care, inexcusable and critical failures, and inordinate delays in meeting child welfare standards, and deliberate indifference and systemic failures to known risks by Defendants from its beginning to its tragic end.  But for Defendants' actions and failures described below to timely meet Florida's child welfare standards including filing the necessary documents and obtaining approval for placement of the children with paternal relatives out of state, SURVIVOR would not have remained in the Abusive Parents' home long enough to suffer years of horrific abuse and neglect or be adopted by them.

9.      Defendants repeatedly and with knowledge of potential dangers ignored red flags and warnings that SURVIVOR faced a known substantial risk of harm in the Abusive Parents' home, including serious abuse and neglect allegations from SURVIVOR's schools, clear evidence that the Abusive Parents' repeatedly lied to case managers and child protective investigators, and SURVIVOR's undeniable deterioration while in the care of the Abusive

3

Parents, including failing school, demonstrating extreme fear of the Abusive Parents, and becoming clinically depressed and having thoughts of suicide.

10.   Despite numerous professional recommendations for therapy, assessments, and treatment, Defendants knowingly failed to meet SURVIVOR's medical, psychological, and educational needs in deliberate disregard for SURVIVOR's safety and well-being.

## PARTIES

11.   Plaintiff, SURVIVOR, a minor child, was born in 2000, and at all times relevant thereto was in the legal and physical custody of DCF and resided in Miami-Dade County.

12.   Due to SURVIVOR's status as a minor child, this action is filed through his next friend, CAROLYN SALISBURY, Executive Director of Lawyers for Children America Florida Office, the entity appointed by the dependency court to supervise the representation of SURVIVOR in the dependency court proceedings following SURVIVOR's return to foster care this year. CAROLYN SALISBURY has been actively involved in and supervised the representation of SURVIVOR.

13.   Due to the nature of the allegations contained herein, SURVIVOR has filed this action using a pseudonym.

14.   The Florida Department of Children & Family Services ("DCF") is the Florida state agency charged under state and federal law with the non-delegable duty of ensuring the health, welfare, and safety of children in state custody; operating the state foster care system; and providing all necessary services for children placed in its care.

15.   Under state law, DCF contracts with private community based agencies to provide foster care and protective services to children in state custody.

16.   Defendant, JEAN LACROIX (hereinafter "LACROIX"), was a Child Protective

4

Investigator ("CPI") employed by DCF, who, at times relevant hereto, investigated allegations that SURVIVOR was being abused and neglected by the Abusive Parents.

17.    At all times relevant hereto, LACROIX was obligated to comply with all state and federal laws and regulations as well as departmental/district procedures regarding children in state care.

18.    As a Child Protective Investigator, LACROIX had the authority and responsibility to: 1) investigate reports of child abuse and/or neglect in accordance with statutory and regulatory requirements, professional child welfare standards, and DCF operating procedures, including but not limited to reviewing and evaluating all prior reports of abuse and neglect; 2) affording children in foster care the same level of protection from abuse and neglect as children and families under investigation in the community; 3) conducting a proper investigation of all relevant conditions of the placement that might affect the safety and well-being of children in the placement; 4) notifying the licensing authority, case managers, and the Guardian Ad Litem of the abuse investigation; 5) completing all relevant collateral contacts with persons who may have information regarding the issues being addressed in the investigation; 6) making appropriate referrals for evaluations and/or services the Child Protection Team ("CPT") and any providers recommended; and 7) ensuring that foster children were not left in dangerous conditions, including being subjected to continued abuse and neglect.

19.    At all times relevant hereto, LACROIX had the ability, authority and the means to remove a child from a placement in which there was a substantial risk of serious harm to the child.  He is being sued in his individual capacity.

20.    Defendant, EUNICE GUILLOT (hereinafter "GUILLOT"), was a Child Protective Investigator ("CPI") employed by DCF, who, at times relevant hereto, investigated allegations

that SURVIVOR was being abused and neglected by the Abusive Parents.

21.     At all times relevant hereto, GUILLOT was obligated to comply with all state and federal laws and regulations as well as departmental/district procedures regarding children in state care.

22.     As a Child Protective Investigator, GUILLOT had the authority and responsibility to: 1) investigate reports of child abuse and/or neglect in accordance with statutory and regulatory requirements, professional child welfare standards, and DCF operating procedures, including but not limited to reviewing and evaluating all prior reports of abuse and neglect; 2) affording children in foster care the same level of protection from abuse and neglect as children and families under investigation in the community; 3) conducting a proper investigation of all relevant conditions of the placement that might affect the safety and well-being of children in the placement; 4) notifying the licensing authority, case managers, and the Guardian Ad Litem of the abuse investigation; 5) completing all relevant collateral contacts with persons who may have information regarding the issues being addressed in the investigation; 6) making appropriate referrals for evaluations and/or services the Child Protection Team ("CPT") and any providers recommended; and 7) ensuring that foster children were not left in dangerous conditions, including being subjected to continued abuse and neglect.

23.     At all times relevant hereto, GUILLOT had the ability, authority and the means to remove a child from a placement in which there was a substantial risk of serious harm to the child.  She is being sued in her individual capacity.

24.     At times relevant hereto, Defendant, LACHERYL HARRIS f/k/a LACHERYL ALVARADO (hereinafter "HARRIS") was an agent and/or employee of DCF, acting as a Family Services Counselor assigned to SURVIVOR's case.

6

25.     At all times relevant hereto, HARRIS was obligated to comply with all state and federal laws and regulations as well as departmental and district procedures regarding children in state care.

26.     As a Family Services Counselor, HARRIS had the authority and responsibility to: 1) ensure the health, safety, and well-being of SURVIVOR while he was in state custody; 2) conduct monthly home visits to assess SURVIVOR's health, safety, and well-being in the Abusive Parents' home; 3) evaluate all reports of child abuse and/or neglect of SURVIVOR and the Abusive Parents' home; 4) continually assess the adequacy and safety of SURVIVOR's placement; 5) ensure SURVIVOR's medical, psychological, and educational needs were being met; 6) make appropriate referrals for evaluations and/or services including referrals to psychologists, psychiatrists, and medical doctors; 7) ensure that SURVIVOR was not left in dangerous conditions, including being subjected to abuse and neglect; and 8) timely request a home study through the Interstate Compact for the Placement of Children (hereinafter "ICPC") to expedite the placement of SURVIVOR with relatives who resided out of the state.

27.     At all times relevant hereto, HARRIS had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. She is being sued in her individual capacity.

28.     At times relevant hereto, Defendant ALICIA PROFF (hereinafter "PROFF") was an agent and/or employee of DCF, acting as a Family Services Supervisor assigned to SURVIVOR's case.

29.     At all times relevant hereto, PROFF was obligated to comply with all state and federal laws and regulations as well as departmental and district procedures regarding children in state care.

30.     As a Family Services Supervisor, PROFF had the authority and responsibility to conduct monthly supervisory reviews with HARRIS, to review case developments, to provide direction and instruction, and had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.  PROFF is being sued in her individual capacity.

31.     Under state law, DCF contracts with private community based agencies and gives them the power to provide foster care and protective services to children in state custody. Under the current system, these agencies are integral to DCF's ability to carry out its public function and objectives.

32.     Defendant OUR KIDS is a corporation organized and existing under the laws of Florida and operates its business primarily in Miami-Dade County, Florida.

33.     At all times material hereto, OUR KIDS was the lead agency for coordination and delivery of community-based foster care and related services in Miami-Dade County, Florida, pursuant to § 409.1671, Florida Statutes, and operated under a contract with DCF to provide such services to children in the custody of DCF, including SURVIVOR.

34.     At all times materiel hereto, Defendant, THE CENTER FOR FAMILY AND CHILD ENRICHMENT, INC. (hereinafter "CFCE") was a corporation organized and existing under the laws of Florida and operates its business primarily in Miami-Dade County, Florida.

35.     OUR KIDS, as the lead agency, subcontracted with CFCE to provide case management services to children in foster care and under protective supervision in Miami-Dade County, including SURVIVOR. OUR KIDS delegated its power to provide foster care and protective services to children in state custody to subcontractors like CFCE, rendering agencies like CFCE also integral to DCF's ability to carry out its public function and objectives.

8

Notwithstanding that subcontract, OUR KIDS retained ultimate responsibility to ensure that the needs of all foster children including the SURVIVOR's needs were met by establishing and using the means necessary to confirm and ensure that CFCE did, in fact, meet SURVIVOR's needs.

36.   At times relevant hereto, Defendant LATEEF IBRAHIM (hereinafter "IBRAHIM") was an agent and/or employee of CFCE, acting as a foster care case manager assigned to SURVIVOR's case.

37.   At all times relevant hereto, IBRAHIM was obligated to comply with all state and federal laws and regulations as well as departmental/district procedures regarding children in state care.

38.   As a foster care case manager, IBRAHIM had the authority and responsibility to: 1) ensure the health, safety, and well-being of SURVIVOR while he was in state custody; 2) conduct monthly home visits to assess SURVIVOR's health, safety, and well-being in the Abusive Parents' home; 3) evaluate all reports of child abuse and/or neglect of SURVIVOR in the Abusive Parents' home; 4) continually assess the adequacy and safety of SURVIVOR's placement; 5) ensure SURVIVOR's medical, psychological, and educational needs were being met; 6) make appropriate referrals for evaluations and/or services including referrals to psychologists, psychiatrists, and medical doctors; and 7) ensure that SURVIVOR was not left in dangerous conditions, including being subjected to abuse and neglect.

39.   At all times relevant hereto, IBRAHIM had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.   IBRAHIM is being sued in his individual capacity.

40.   At times relevant hereto, Defendant, ANGELA WILLIAMS (hereinafter "WILLIAMS") was an agent and/or employee of CFCE, acting as a foster care supervisor

assigned to SURVIVOR's case.

41.    At all times relevant hereto, WILLIAMS was obligated to comply with all state and federal laws and regulations, DCF departmental and district procedures regarding children in state care.

42.    As a foster care supervisor, WILLIAMS had authority and responsibility to conduct monthly supervisory reviews with IBRAHIM and other case managers, to review case developments and to provide direction and instruction, and had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child.  WILLIAMS is being sued in her individual capacity.

43.    At times relevant hereto, Defendant, ROBERTA THEOC (hereinafter "THEOC") was an agent and/or employee of Defendant CFCE, acting as a foster care and adoption case manager assigned to SURVIVOR's case.

44.    At all times relevant hereto, THEOC was obligated to comply with all state and federal laws and regulations as well as departmental and district procedures regarding children in state care.

45.    As a foster care and adoption case manager, THEOC had the authority and responsibility to:  1) ensure the health, safety, and well-being of SURVIVOR while he was in state custody; 2) conduct monthly home visits to assess SURVIVOR's health, safety, and well-being in the Abusive Parents' home; 3) evaluate all reports of child abuse and/or neglect of SURVIVOR and the Abusive Parents' home; 4) continually assess the adequacy and safety of SURVIVOR's placement; 5) ensure SURVIVOR's medical, psychological, and educational needs were being met; 6) make appropriate referrals for evaluations and/or services including referrals to psychologists, psychiatrists, and medical doctors; and 7) ensure that SURVIVOR was

10

not left in dangerous conditions, including being subjected to abuse and neglect.

46.    At all times relevant hereto, THEOC had the ability, authority, and the means to remove a child from a foster home placement in which there was a substantial risk of serious harm to the child. THEOC is being sued in her individual capacity.

47.    At times relevant hereto, Defendant, YVES FRANCOIS (hereinafter "FRANCOIS") was an agent and/or employee of CFCE, acting as an adoption unit supervisor assigned to SURVIVOR's case.

48.    At all times relevant hereto, FRANCOIS was obligated to comply with all state and federal laws and regulations as well as departmental / district procedures regarding children in state care.

49.    As adoption unit supervisor, FRANCOIS had authority and responsibility to conduct monthly supervisory reviews with THEOC and other adoptions case workers, to review the entire adoption file and case developments and to provide direction and instruction, and had the ability, authority, and the means to recommend against adoption where circumstances required such recommendation. FRANCOIS is being sued in her individual capacity.

## GENERAL FACTUAL ALLEGATIONS

50.    On March 26, 2004, at nearly the age of four years old, SURVIVOR and his biological sibling Victim, came into DCF custody as a result of their biological father's arrest.

51.    SURVIVOR's biological mother previously had her parental rights terminated.

52.    On the same day SURVIVOR came into DCF custody, DCF placed SURVIVOR in the foster home of Abusive Mother and Abusive Father.

53.    Pursuant to section 39.001(1)(h), Florida Statutes, DCF, through its case workers, was required to achieve permanency either though reunification with SURVIVOR's natural

parents or adoption within one year, by March 26, 2005.

54.    Upon information and belief, HARRIS and PROFF were the case manager and supervisor assigned to SURVIVOR's case at the time he entered care in 2004.

55.    Throughout the time that HARRIS and PROFF were responsible for SURVIVOR's care, there were warnings and red flags that they should have recognized in the Abusive Parents' home that would have resulted in SURVIVOR's and his sister's removal and ultimate placement with their out-of-state relatives.

56.    On March 30, 2004, just four days after SURVIVOR came into care, SURVIVOR's out-of-state relatives, Mr. and Mrs. King, referred to by pseudonym, informed DCF that they were interested in caring for SURVIVOR.

57.    Pursuant to section 39.521(1)(d), (3)(c)-(d), Florida Statutes, placement with adult relatives was to take priority over an out-of-home licensed foster care placement, and as such, SURVIVOR and Victim should have been placed in the King home as soon as diligence rendered this possible .

58.    As a result, DCF notified the court the same day that SURVIVOR had relatives out of state who were willing to take custody, and the court ordered DCF to begin the Interstate Compact on the Placement of Children ("ICPC") process.

59.    Despite having been ordered to begin the ICPC process over two (2) weeks earlier, DCF did not seek the Order of Compliance necessary for it to file the ICPC paperwork with the foreign state until April 14, 2004.

60.    On that date, DCF first sought and received an Order of Compliance with ICPC, recommending that the children be placed with their paternal relatives out of state.

61.    On or about April 19, 2004, American Therapeutic Corporation conducted a

Comprehensive Behavioral Health Assessment ("CBHA") of SURVIVOR and his sister Victim in accordance with DCF Operating Procedure 155-10.

62.     Upon information and belief, in conformity with the above requirements, the CBHA provided a comprehensive and thorough assessment of: 1) important facts about the early history of SURVIVOR prior to his entry into care; 2) his current physical/medical, social-emotional and developmental status; 3) how he was transitioning into family life in the Abusive Parents' home; and 4) early perspectives of the Abusive Parents as to the care of SURVIVOR.

63.     Although the CBHA is missing from the records, the SURVIVOR's initial case plan notes that the CBHA recommended play therapy so that Victim could address her feelings of separation.

64.     Upon information and belief, the CBHA also referenced that at the time of her birth, Victim was diagnosed with a significant and serious medical condition that necessitated visits to a specialist for monitoring and treatment at least four times per year, a strict regimen of medications to regulate her condition, and careful attention and monitoring at home.

65.     Upon information and belief, Abusive Mother reported no history of abuse, sexual acting out, or behavioral problems with SURVIVOR or his sister when the CBHA was conducted in April 2004.

66.     Upon information and belief, the CBHA for SURVIVOR described the SURVIVOR as a healthy, happy, and well adjusted child when he came into care.

67.     Upon information and belief, HARRIS failed to ensure the CBHA was made a part of SURVIVOR's case file.

68.     Upon information and belief, HARRIS failed to provide the CBHA to the Guardian ad Litem ("GAL").

69.     Upon information and belief, HARRIS failed to provide the CBHA to any of SURVIVOR's medical, psychological, or educational providers when necessary to conduct an accurate and complete evaluation of SURVIVOR's needs.

70.     On April 27, 2004, PROFF finally assigned a Family Services Counselor to initiate the ICPC paperwork which had been ordered on April 14, 2004.

71.     On August 4, 2004, four months after the CBHA recommended therapy for the Victim, HARRIS documented "no services necessary at this time," despite the fact that no therapy had yet been provided

72.     Upon information and belief, PROFF and/or HARRIS failed to complete the necessary documentation for the ICPC home study to be conducted out of state until sometime after August 31, 2004, a full five (5) months after being notified of the possible relative placement.

73.     On August 31, 2004, as a result of the lengthy delays by DCF, the natural father, through counsel, offered to pay for a private home study to expedite the placement of the SURVIVOR and his sister with his relatives out of state.

74.     On August 31, 2004, despite the CBHA recommendation and case plan for Victim requiring play therapy, HARRIS notified the dependency court that she had taken no action to obtain therapy.

75.     As a result, the Court ordered expedited play therapy for both children.

76.     On September 24, 2004, as a result of a number of requests by the GAL, PROFF finally attempted to arrange an emergency appointment with PyschSolutions to initiate play therapy due to the prior failure to obtain play therapy for SURVIVOR, and rather than agree to this appointment, Abusive Mother stated that she would have to check with her husband, Abusive

Father, before committing to anything.

77. On or about September 27, 2004, in order to implement play therapy recommended by the CBHA, required by the case plan, and ordered by the Court, PROFF finally arranged for an intake evaluation by PsychSolutions, Inc., which conducted an assessment of SURVIVOR to determine his need for therapy.

78. Upon information and belief, HARRIS failed to provide PsychSolutions with the CBHA, SURVIVOR's family history, or any of the underlying facts contained in the CBHA that led to the initial recommendation for play therapy.

79. On September 27, 2004, Abusive Mother reported to PsychSolutions that neither SURVIVOR nor his sister had any behavioral issues and that there was no history of physical or sexual abuse or any medical conditions notwithstanding Abusive Mother's later report that Victim had been acting out sexually, and as a result, PsychSolutions concluded that SURVIVOR and his sister did not meet Medicaid requirements for mental health services.

80. Victim never received the necessary play therapy recommended in the CBHA.

81. Despite Abusive Mother's prior report of no abuse history or behavioral problems to PsychSolutions just three months earlier, and no such history provided to DCF or any other person, on December 13, 2004, Abusive Mother informed the GAL Volunteer, for the first time, that when the children were initially placed in her home, Victim acted out in a sexual manner, that these behaviors had resumed since having visitation with her biological father, and that there were behavioral issues with both children.

82. As a result of this information, on December 14, 2004, the GAL informed the court and HARRIS of his concerns about Victim's sexual behavior as disclosed by Abusive Mother, and that the PsychSolutions evaluation in September 2004 had concluded therapy was

not needed.

83.    Therefore, the Judge ordered DCF to have another evaluation done by Dr. Edward Sczechewicz, the psychologist who previously evaluated and provided therapy to the biological father, and to get the children therapy as soon as possible.

84.    The failure of Abusive Mother to report Victim's sexual behavior to HARRIS when it first occurred months earlier and then to PsychSolutions in September 2004, should have raised concern to HARRIS as to the Abusive Parents' capacity to appropriately care for Victim and her psychological needs.

85.    On December 16, 2004, just two days after HARRIS learned that Abusive Mother did not report and ignored the earlier claims that Victim had been acting out sexually, the nurse practitioner at Victim's doctor's office contacted HARRIS because she wanted to be sure Victim did not miss her appointment scheduled for December 21, 2004, because she had not been for a follow-up appointment since January 2004, almost one year prior, despite the necessity of Victim seeing the doctor every four months for her serious medical condition.

86.    The nurse practitioner advised HARRIS that the Abusive Parents never attended appointments with the children but rather sent them alone with transportation, that they could not provide appropriate care for Victim's condition if they did not attend appointments, and that Victim had missed her necessary follow-up appointments.

87.    The nurse practitioner informed HARRIS that she was concerned that SURVIVOR and Victim were "not in a good placement because the foster parent does not care for the child's well being if she does not attend the medical appointments with the child."

88.    The nurse practitioner expressed concern to HARRIS that Victim may need to be placed in a medical foster home because she was "very medically needy and should not be

16

missing appointments because the foster parent does not want to take her."

89.     The nurse practitioner further expressed concern for Victim "if the placement is adoptive because the foster parent would then have the sole responsibility to care for the child and she does not believe that will happen."

90.     Finally, the nurse practitioner advised HARRIS that SURVIVOR and Victim had not had their four year old shots and she did not know how it was possible for them to be in daycare without them.

91.     HARRIS failed to report the significant concerns raised by the nurse practitioner of the Abusive Parents' conduct which constituted medical neglect, to the abuse hotline so that it could be investigated which was a violation of § 39.201, Florida Statutes and a misdemeanor offense.

92.     Pursuant to DCF Operating Procedure 175-28, if HARRIS and/or PROFF reported this medical neglect as mandated by Florida law, the allegations would have been verified and SURVIVOR and Victim would have been removed from the Abusive Parents' home immediately.

93.     Upon information and belief, this removal would have resulted in SURVIVOR and Victim being placed in a medical foster home or with their out-of-state relatives.

94.     Upon information and belief, HARRIS neither notified anyone nor took any action whatsoever about these serious allegations and concerns for the SURVIVOR and Victim's care and well-being other than making a case note of the conversation.

95.     Additionally, the failures of HARRIS and PROFF to themselves monitor Victim's known serious medical and psychological conditions and to remove SURVIVOR and Victim from Abusive Parents' custody for failing to follow up with necessary medical appointments and

address known psychological needs for therapy and sexual abuse placed Victim at substantial risk of serious harm.

96.     On January 26, 2005, Dr. Sczechewicz conducted his evaluation regarding Victim's sexualized behavior and Victim disclosed to him that Abusive Father, not her biological father, "tickled her private parts."

97.     Because of his statutory duty to report, Dr. Sczechewicz called the DCF Abuse Hotline to report the allegations of sexual abuse of Victim by Abusive Father, which resulted in an abuse investigation.

98.     During the abuse investigation, it was initially unclear to the Child Protective Investigator ("CPI") whether the accounts by SURVIVOR of possible sexual abuse were with regard to SURVIVOR's biological father or Abusive Father.

99.     On or about January 28, 2005, the CPI spoke with HARRIS regarding the sexual abuse allegations at which time HARRIS advised that she was aware that the report was being called in, that there was "little concern" about the Abusive Parents, and she did not believe a change of placement was necessary despite the possibility raised that the children were being sexually abused in the Abusive Parents' home.

100.    In discussing whether a change of placement was appropriate because of allegations involving Abuse father and the possibility of sexual abuse having taken place in the foster home, Harris also failed to inform the CPI of the allegations of medical neglect raised by the Nurse Practitioner who had already suggested the need for a change of placement.

101.    However, on January 28, 2005, Abusive Mother again expressed to the CPI that SURVIVOR and his sister acted out when they were first placed in her home and only resumed those behaviors after having visitation with their biological father.

18

102.   Abusive Mother claimed that she had reported this behavior to HARRIS and the GAL several times, but nothing was done.

103.   The Abusive Parents' claims mark a serious failure on the part of HARRIS in that either: 1) HARRIS did in fact have knowledge that SURVIVOR and his sister were experiencing harm months earlier and required evaluation and treatment for behavioral issues surfacing after visitation with their biological father and did nothing about it; or 2) the Abusive Parents fabricated these claims and lied about informing HARRIS, in which case HARRIS should have been alerted that the Abusive Parents were not fit to be foster parents.

104.   In either event, HARRIS' actions exposed the SURVIVOR and his sister to a known substantial risk of serious harm.

105.   On or about February 9, 2005, the CPI followed up with HARRIS who advised that she informed the court of the concerns that the biological father may have sexually abused the children and that there were "no further concerns" as to the Abusive Parents.

106.   Based upon Dr. Sczechewicz's findings that Victim's story was not credible, Abusive Mother's claims that Victim was sexually acting out when first placed and after resuming visits with her biological father, the initially ambiguous accounts by SURVIVOR as to whether the acts were those of their biological father rather than their Abusive Father, and HARRIS' statement that there was "little concern" regarding the Abusive Parents and that she did not believe a change of placement was necessary, the abuse report against Abusive Father was closed with no indicators.

107.   On February 16, 2005, despite the allegations of sexual acting out by the Victim, HARRIS documented "there are no services needed at this time."

108.   On February 16, 2005, contrary to what was expressed by the nurse practitioner to

19

Harris just two months prior, Adoptive Mother advised HARRIS that the children did not need immunizations until they were five and that Victim did not need to be seen by the doctor until she was older because her surgery was in 2000.

109.   Upon information and belief, there is no indication that HARRIS followed-up with the doctor's office to address the discrepancy between the nurse practitioner's concerns and Adoptive Mother's statements regarding continuing medical care for the children.

110.   On February 23, 2005, PROFF noted that she conducted a supervisory review which made no mention of the sexual abuse allegations, necessary medical treatment or therapy, or any other significant issue upon which she should have been advising HARRIS.

111.   In his report to the court dated February 23, 2005, Dr. Sczechewicz indicated that SURVIVOR denied any sexual abuse, but that Abusive Mother claimed SURVIVOR had an episode of bed wetting subsequent to visiting his biological father.

112.   Dr. Sczechewicz also stated in his report that SURVIVOR reported being hit with the hand by both his biological father and the Abusive Parents, although he was unsure if the allegations as to the Abusive Parents were true.

113.   Again, despite the serious allegations of potential abuse and behavioral issues resulting therefrom, now including SURVIVOR's bed wetting episode, HARRIS did nothing to obtain therapeutic treatment for SURVIVOR or Victim, further investigate the allegations of potential physical abuse by Abusive Parents, or contact the abuse hotline in accordance with the mandatory reporting requirements of the Florida Statutes.

114.   On or about February 23, 2005, Dr. Sczechewicz reported to the court that the children were not victims of sexual molestation, but might benefit from counseling.

115.   However, based upon the continued belief that SURVIVOR and his sister might

20

have been sexually abused by their biological father, Pam Garman from the Children and Special Needs Center conducted a forensic interview on March 15, 2005.

116.    Although Dr. Sczechewicz did not believe SURVIVOR and his sister were victims of molestation, the forensic interview concluded that both SURVIVOR and Victim disclosed sexual abuse by their biological father only, and this conclusion was ultimately used to support the filing of criminal charges against SURVIVOR's biological father and termination of his parental rights.

117.    Despite the allegations that SURVIVOR and his sister were victims of sexual abuse and the earlier recommendation for play therapy, HARRIS still failed to even seek, let alone obtain, therapy for Victim and his sister, and instead repeatedly documented that no services were necessary, in deliberate disregard of the children's needs, safety, and well-being.

118.    Pam Garman noted in her forensic interview regarding the allegations of sexual abuse that both SURVIVOR and his sister appeared to have a slight speech problem.

119.    Upon information and belief, neither SURVIVOR nor his sister had speech or any other developmental disorders or conditions prior to being placed with the Abusive Parents.

120.    Upon information and belief, HARRIS never once noted that either SURVIVOR or his sister demonstrated a speech problem in any case record.

121.    Evidence of a newly-developed speech problem should have resulted in 1) speech evaluations for both SURVIVOR and his sister to determine if speech therapy was necessary, and 2) an assessment as to the cause of the problem, given that SURVIVOR had then been in the care of the Abusive Parents for one year.

122.    However, in reckless disregard of the children's needs and safety, HARRIS took no action whatsoever to have SURVIVOR evaluated or assessed for speech therapy or to

determine whether SURVIVOR developed this problem while in the care of the Abusive Parents.

123.   Despite serious allegations and concern expressed by Victim's nurse of Abusive Parents' failure to be taken to important medical appointments and need for a change in placement, evidence of the failure to address and report therapeutic concerns and knowledge of behavioral issues that required immediate attention including the possibility that SURVIVOR and his sister were victims of sexual abuse, and evidence that SURVIVOR might have been deteriorating while in the Abusive Parents' care, neither PROFF nor HARRIS took any action to investigate, reevaluate and change the children's placements the foster home or provide necessary assessments and treatment to SURVIVOR, in reckless disregard for his safety and well-being.

124.   On March 18, 2005, contrary to the clearly established record indicating otherwise and in complete disregard for the children's safety and well-being, HARRIS documented that "the children have no known illnesses at this time" and "there are no services needed at this time."

125.   On April 18, 2005 and May 10, 2005, HARRIS once again documented that no services were needed at this time, in complete disregard for safety and well-being of the children based on the concerns and recommendations expressed by professionals.

126.   As of March 26, 2005, one year after the SURVIVOR had been in foster care, Defendants did not cause them to achieve permanency as required by section 39.001(1)(h), Florida Statutes.

127.   On May 16, 2005, fourteen months after the Court's original order on April 14, 2004, authorizing DCF to seek placement of the children with their out-of-state relatives, the relative placement home study was still not completed , and on May 18, 2005, DCF, PROFF,

and/or HARRIS notified the Court that the home study was not complete.

128. On June 29, 2005, DCF and HARRIS received a hard copy of the completed, positive home study.

129. On July 20, 2005 despite unquestionably having had the completed and positive home study in their possession for no less than three (3) weeks, PROFF, and/or HARRIS informed the court that they still had not received it.

130. In addition to the inexcusable delays in completing the ICPC process and obtaining the completed and positive home study, the lack of vigilance for and disinterest in receipt of such study, and misleading the court about the study's availability, HARRIS and PROFF should have presented the need for an expedited determination to the Court in light of the medical neglect, discrepancies and lies told by Abusive Mother, sexual abuse allegations regarding the Abusive Parents, and evidence that SURVIVOR had been deteriorating while in the Abusive Parents' home.

131. However, in deliberate disregard for SURVIVOR's safety and well-being, HARRIS and PROFF failed to notify the court of these matters so that it could be properly and well informed when the time came to make a final placement determination.

132. In or about June 2005, DCF pursuant to section 409.1671, Florida Statutes, DCF which contracted with OUR KIDS for the direct role and duties for provision of foster care and related services in Miami-Dade County., transferred SURVIVOR's case to OUR KIDS, the lead agency for Miami-Dade County.

133. Upon transfer of the case to OUR KIDS, its subcontractor, CFCE assumed responsibility for the provision of case management services.

134. Upon information and belief, on or about June 2005, DCF and HARRIS fell

below the standard of care and failed to ensure the files were complete and that the CBHA of the SURVIVOR and his sister was provided to OUR KIDS and did not ensure that there was an appropriate transfer of the case and continuity of care during such transfer.

135.    Upon information and belief, OUR KIDS and CFCE fell below the standard of care by accepting responsibility for the case file without obtaining a full and complete case file and the history of the case, without obtaining the CBHA, without appropriately reviewing the status of and evaluating the case and the file, and without contacting the SURVIVOR's out-of-state relatives so that it would have an appropriate history of SURVIVOR and Victim.

136.    Upon information and belief, it was OUR KIDS' responsibility to request and review necessary records from DCF prior to accepting transfer of a case.

137.    Upon information and belief, when DCF transferred existing cases in which children were already in a foster care placement, OUR KIDS assumed the appropriateness and safety of placements without conducting any review of its own.

138.    Upon information and belief, a transfer checklist was required to be utilized to determine if all necessary records had been received and reviewed.

139.    Upon information and belief, no transfer checklist was completed for SURVIVOR's case because of pressure from DCF to complete the transfer.

140.    Upon information and belief, OUR KIDS failed to request crucial records and documentation to ensure SURVIVOR's continuity of care and continued receipt of necessary care and services, including but not limited to, the CBHA, birth certificates, chronological case notes, and abuse reports.

141.    Despite lacking critical documentation and information, OUR KIDS fell below the standard of care and accepted SURVIVOR's case for transfer without critical case records and

transition interviews because of pressure from DCF, and it immediately assigned the case to CFCE for case management.

142.   Upon information and belief, neither OUR KIDS nor CFCE conducted any form of case transfer review or meeting with DCF or HARRIS to ensure that the new case manager would have all necessary background and information about SURVIVOR's case, placement, current needs and red flags.

143.   Upon information and belief, neither OUR KIDS nor CFCE requested or reviewed the initial CBHA to learn of the SURVIVOR's needs upon coming into care and failed to request or provide an updated assessment in order to determine if the level of care being provided was appropriate and if SURVIVOR was receiving all necessary services.

144.   Upon information and belief, neither OUR KIDS nor CFCE conducted any form of intake, staffing, assessment, or review to determine SURVIVOR's then current needs upon assuming responsibility for his care.

145.   Upon information and belief, no later than July 2005, CFCE assumed responsibility for providing case management services to SURVIVOR, and, as described above did nothing to inform itself or the case manager about SURVIVOR's case and ensure appropriate continuity of care.

146.   As a result of this fatally flawed transition, OUR KIDS and CFCE failed to learn crucial information about SURVIVOR's condition upon entering foster care, his prior identified needs, the sexual abuse allegations, behavioral issues, and significant problems and potential dangers within the Abusive Parents' home.

147.   Upon information and belief, when CFCE assumed responsibility for providing case management services to SURVIVOR, THEOC and WILLIAMS were the case manager and

supervisor assigned to the case.

148.    In August 2005, SURVIVOR and his sister were to begin kindergarten; however, because the Abusive Parents had not been provided with the children's birth certificates, they could not be registered for school.

149.    The Abusive Parents notified the CFCE case manager, THEOC that they needed the birth certificates to enroll SURVIVOR in school numerous times.

150.    As a result of OUR KIDS' failure to obtain birth certificates from DCF and CFCE'S failure to timely obtain birth certificates upon discovery of this fact, SURVIVOR and his sister were not enrolled in school until November 17, 2005, a full three (3) months into the school year.

151.    OUR KIDS and CFCE also assumed responsibility for SURVIVOR's case shortly after the ICPC home study was approved for placement with their out-of-state relatives in May 2005, but failed to use reasonable care and caused or contributed to the five month delay in informing the Court of the positive home study.

152.    Upon information and belief, neither HARRIS, PROFF, OUR KIDS, CFCE, THEOC, nor WILLIAMS notified the court of the completed and positive finding of the ICPC home study until August 4, 2005, nearly three (3) months after its completion and over one (1) month after clear evidence of its receipt.

153.    Therefore, the court was not made aware of the completed and positive finding of the ICPC home study until over sixteen (16) months after DCF, PROFF, and HARRIS were made aware of the possible relative placement and ordered to facilitate ICPC proceedings.

154.    As a direct result of the inexcusable and lengthy delays and failures of HARRIS, PROFF, OUR KIDS, CFCE, THEOC, and WILLIAMS to inform the Court of the medical and

26

psychological neglect and possible deterioration of the SURVIVOR and Victim, the GAL and the court had concerns about removing SURVIVOR and his sister from the Abusive Parents' home after the length of time they had spent in their care, and on August 4, 2005, the court ordered a psychological evaluation of SURVIVOR and his sister by Dr. Vanessa Archer to determine the issue of appropriate placement.

155.   During the seventeen (17) months the SURVIVOR had been in care until this time, despite the inexcusable delays in processing the ICPC paperwork, DCF had consistently maintained the position that SURVIVOR and his sister should be placed with their relatives in Texas if the outcome of the home study was positive in accordance with section 39.521, Florida Statutes.

156.   However, upon assuming case management responsibilities for SURVIVOR's case, without having appropriately reviewed the file to determine that medical and psychological care had been withheld from the children, without having obtained other necessary documentation to understand the children's history and information concerning the children, and without having spoken to persons mentioned above concerning concerns that had been raised, CFCE and THEOC departed from the standard of care and immediately took the position that SURVIVOR and his sister should remain with and be adopted by the Abusive Parents, in direct contravention of the law and the established history of the case.

157.   As a result of this position, CFCE and THEOC engaged in a concerted effort to advocate for and ensure that SURVIVOR and his sister would remain with the Abusive Parents to be adopted.

158.   Although clueless, CFCE and THEOC's misrepresentations to the court became a roadblock to the proper placement of the children.

159.    CFCE and THEOC took these actions in complete ignorance of the case and the children involved, demonstrating deliberate indifference to SURVIVOR's safety and well-being.

160.    On September 13, 2005, Dr. Vanessa Archer conducted her evaluation of SURVIVOR and Victim.

161.    Upon information and belief, CFCE did not have the necessary documentation in its possession to provide to Dr. Archer with a complete history of the SURVIVOR because it was not provided to them by OUR KIDS and it was not requested by them from OUR KIDS during the case transfer process.

162.    However, at the time of Dr. Archer's evaluation, CFCE and THEOC had a duty to ensure that they obtained the necessary background including such information related to potential neglect and abuse, the CBHA, case history and positive home study and consultation with the out-of-state relatives and provide these documents and information to Dr. Archer so she could conduct a proper assessment and make valid recommendations based upon professional judgment.

163.    OUR KIDS, CFCE, and THEOC only provided the following historical information to Dr. Vanessa Archer: 1) the order for the evaluation; 2) the 2004 Shelter Order; and 3) the Detention and Dependency Petitions from 2000, while facilitating a consultation with Abusive Mother.

164.    Since the petitions from 2000 were a result of SURVIVOR being born to a known drug addicted biological mother, they provided no relevant information as to SURVIVOR's early life, his history residing with his biological father, or his and his sister's behavior or condition since being placed in the Abusive Parents' home.

165.    Accordingly, the only relevant sources of information for Dr. Archer's evaluation

were interviews with Abusive Mother, SURVIVOR, and Victim.

166.  Upon information and belief, CFCE and THEOC fell below the standard of care and failed to provide Dr. Archer with any of the potentially detrimental information that might have resulted in a finding that the children should be removed from the Abusive Parents' home and placed with their out-of-state relatives.

167.  In her September 2005 report, Dr. Archer concluded that SURVIVOR and his sister presented with attachment difficulties that SURVIVOR appeared to have some minor speech problems, and that Victim had trouble providing a logical and coherent account of events.

168.  Upon information and belief, SURVIVOR was not referred for any services as a result of Dr. Archer's report.

169.  CFCE, THEOC and/or OUR KIDS departed from the standard of care and failed to take steps which would have ensured that Dr. Vanessa Archer was provided: 1) an appropriate history; 2) the positive home study of the King family; 3) the CBHA; and 4) the critical concerns that existed regarding the placement with Abusive Parents including the belatedly disclosed allegations of sexual abuse by Abusive Mother, the medical neglect allegations of the nurse practitioner, and the evidence that SURVIVOR might have been deteriorating while in the Abusive Parents' home.

170.  Abusive Mother used this to her advantage and lied to Dr. Archer about SURVIVOR's placement history, indicating that SURVIVOR only briefly resided with his biological father and that he spent time in approximately three (3) or four (4) different foster homes prior to being placed in the Abusive Parents' home.

171.  Abusive Mother also told Dr. Archer that SURVIVOR had no prior relationship with his out-of-state relatives, which was directly and patently contrary to the information

contained in SURVIVOR and Victim's case record as well as the positive home study on the King family.

172. Had CFCE and/or THEOC provided Dr. Archer with the proper and necessary information, she would have known the information provided by Abusive Mother was false, raising concerns about the truthfulness of ABUSIVE MOTHER.

173. As a direct result of CFCE, THEOC and/or OUR KIDS' acts and omissions resulting in the failure to provide an appropriate history and erroneous information supplied by Abusive Mother, the length of time SURVIVOR had been in her care due to Defendants' delays, and the failure to notify her of the prior medical neglect by the Abusive Parents, Dr. Archer concluded that SURVIVOR suffered from attachment difficulties due to multiple failed placements and thus removing him from the Abusive Parents' home and placing him with relatives with whom he had no prior relationship would be extremely detrimental to his emotional well-being.

174. Dr. Archer's conclusions formed the basis for the Court's decision to leave SURVIVOR in the Abusive Parents' home.

175. Despite clear knowledge that the information Abusive Mother provided to Dr. Archer was false and that Dr. Archer at least partially relied upon this information to reach her conclusions, CFCE and THEOC failed to take any action to correct this false information or otherwise ensure that Dr. Archer's assessment and conclusions were in fact valid.

176. CFCE and THEOC either disregarded Dr. Archer's report, thereby deliberately failing to learn of the false information provided therein or did learn of the false information and failed to ensure it was corrected creating a substantial risk of serious harm to SURVIVOR and Victim resulting from an inappropriate placement decision and denial of SURVIVOR's rights to

30

be placed with relatives.

177.   As a result of Defendants' deliberate indifference in failing to timely file the ICPC paperwork, failing to timely notify the Court of the positive result, and failing to provide Dr. Archer with accurate information and/or correct the clearly false information upon which she relied, SURVIVOR was in fact denied his right to be placed with and adopted by his biological family.

178.   On January 11, 2006, CFCE and THEOC filed a Judicial Review Social Study Report indicating that SURVIVOR had no mental health providers or treatment.

179.   On January 22, 2006, despite documentation alleging sexual abuse, medical neglect, educational neglect, and failure to provide recommended services, THEOC reported that the Abusive Parents advised that the children had been "doing well" in their placement for almost two years.

180.   Sometime between January and February 2006, THEOC ceased acting as SURVIVOR's foster care case manager, with a few different CFCE employees filling that role until a new permanent case manager was assigned in April 2006.

181.   On February 20, 2006, OUR KIDS and/or CFCE employees documented that "all is well" and there were "no problems reported" with the children.

182.   On February 23, 2006, DCF received an abuse report from SURVIVOR's elementary school, alleging that Victim had a huge bruise on her chin and neck area, bruises and scratches on her back area, and had missed several days of school.

183.   LACROIX was the DCF CPI assigned to investigate this abuse report.

184.   Upon visiting SURVIVOR and Victim at school the day the report was received, LACROIX visually confirmed the reported bruises and scratches and also noted that Victim had

31

a rash on her scalp.

185.   LACROIX observed Victim to be very hyper and dirty with her hair not washed and done.

186.   During the face-to-face interview with Victim, she alleged that she slipped and fell in class and that was how she got the bruise on her chin, but she could not give LACROIX an explanation for the red spot on her back.

187.   Victim also could not provide LACROIX with an exact account of how the injury to her chin occurred.

188.   However, Victim's teacher informed LACROIX that Victim told her she fell at home when the teacher noticed the bruise, but then told the counselor that she fell in class.

189.   LACROIX indicated that she did not know what to believe, but when she asked Victim to show her where it happened, Victim could not do so and started to pull back.

190.   Victim's teacher also reported that she sometimes comes to school dirty.

191.   Additionally, LACROIX obtained Victim's attendance records, which indicated that she had seventeen (17) absences raising concerns that she had been educationally neglected during the short three (3) months since she had been in school from November 17, 2005 to February 23, 2006.

192.   That same day, LACROIX conducted a face-to-face interview with Abusive Mother and Abusive Father at the home in the presence of the children.

193.   The Abusive Parents denied any knowledge of the bruise and indicated that it could not have happened at home.

194.   While LACROIX was discussing the injury with Abusive Mother, Victim jumped in the middle of the conversation and said that she fell in class.

32

195.   When LACROIX notified the Abusive Parents of Victim's scalp problem, they indicated it was probably due to the medications she was taking for her medical condition and that they would check with her doctor.

196.   As a result of the bruises and scalp problem, on February 24, 2006, LACROIX referred Victim for an examination by the Child Protection Team ("CPT"), a statutorily mandated multi-disciplinary team composed of medical professionals who supplement the assessment and protective supervision activities of DCF and provide specialized and supportive services in processing child abuse and neglect cases.

197.   On February 26, 2006, just three (3) days after receipt of the abuse report and LACROIX's visit to the Abusive Parents' home, CFCE allegedly conducted a home visit with SURVIVOR, during which Abusive Mother failed to disclose the abuse report to the case manager and falsely reported that there were no concerns and that SURVIVOR and Victim were doing well in the home and at school.

198.   That same day, a second-party reviewer involved in the investigation noted instructions to LACROIX that he needed to contact both the OUR KIDS' liaison and CFCE, through the then acting case manager, Rick Spears.

199.   LACROIX noted that he informed licensing of the abuse report, but upon information and belief neither OUR KIDS nor the licensing provider, Kids Hope United, informed CFCE or Rick Spears.

200.   On February 28, 2006, CFCE, through Rick Spears, provided a false and inaccurate status report to the Court, indicating that SURVIVOR and his sister were doing well in their placement, attending school regularly, and that the Abusive Parents were interested in adopting the children.

33

201.  Had LACROIX notified CFCE or Rick Spears of the abuse investigation as required by law and instructed by superiors and/or had OUR KIDS ensured that CFCE was made aware of the abuse report after being notified themselves, the Abusive Parents would not have been able to continue to lie about SURVIVOR's well-being and the report to the Court would have been accurate about the risks to SURVIVOR in the Abusive Parents' home.

202.  On March 3, 2006, despite the fact that it was the middle of a school year and the Abusive Parents were not moving, but remained in the same home, the Abusive Parents withdrew the children from their elementary school and transferred them to a new school in violation of § 39.4085(17), Florida Statutes, which sets forth a goal that foster children have minimal disruption to their education and retention in their home school.

203.  The Survivor and Victim's transfer was just eight (8) days after the abuse report was called in and before CPT had even examined Victim.

204.  Upon information and belief, the Abusive Parents transferred SURVIVOR to a new school as a direct result of the abuse report to avoid future monitoring by the school that was concerned about the well-being of SURVIVOR and his sister.

205.  By March 2006, SURVIVOR and his sister had been in care for two (2) years, despite statutory requirements of section 39.001(1)(h), Florida Statutes, that permanency be reached within one year.

206.  On March 6, 2006, eleven (11) days after the abuse report was received and visible bruises were observed by LACROIX, Victim was finally seen by CPT.

207.  By the time the Victim was seen at CPT, she could not be accurately examined and/or assessed because she no longer had any visible bruises, so CPT purportedly concluded that this was not a case of child abuse, but CPT did recommend that Victim have a psycho-

34

educational evaluation to be tested for hyperactivity.

208.   By the time of CPT's recommendation that Victim required an assessment for hyperactivity in March 2006, there had been no less than six (6) recommendations and/or identified needs for evaluation and therapy of SURVIVOR or his sister in the two (2) years since entering foster care.

209.   HARRIS, PROFF, OUR KIDS, CFCE, THEOC, and WILLIAMS failed to seek and/or obtain the assessments and therapy despite SURVIVOR's clearly identified needs and professional recommendations.

210.   Upon information and belief, LACROIX never conducted a private interview with Victim or SURVIVOR, in direct contravention of statutory requirements and with deliberate indifference to SURVIVOR's safety.

211.   Upon information and belief, LACROIX never obtained an actual explanation from Victim of how the injury occurred.

212.   Upon information and belief, LACROIX never followed up with the Abusive Parents about Victim's scalp condition and never made collateral contact with Victim's doctor to find out if her medications could cause such a condition as the Abusive Parents claimed.

213.   Upon information and belief, LACROIX never contacted CFCE, the SURVIVOR's temporary case manager, Rick Spears, or SURVIVOR's GAL to inform them of the allegations or discuss any of the issues raised during his investigation, including potential educational neglect.

214.   Upon information and belief, LACROIX did not provide CPT with accurate information about the circumstances surrounding the bruises, the manner in which Victim changed her story about where the incident took place, Victim's scalp condition and unclean

conditions, and the inordinate number of absences from school and potential educational neglect in order for them to conduct a proper evaluation as to whether this was a case of child abuse and/or neglect.

215.   Despite there being an open investigation, LACROIX could not possibly have conducted any follow-up visits or made any additional contacts with SURVIVOR's school after his initial contact on February 23, 2006, otherwise he would have learned that the Abusive Parents transferred SURVIVOR to a different school.

216.   In fact, there is no evidence to suggest that LACROIX took any additional action or made any of the required collateral or follow-up contacts on the case after his initial investigation on February 23, 2006, other than contacting CPT and licensing on February 24, 2006.

217.   On March 8, 2006, CFCE conducted a home visit and once again the Adoptive Parents failed to make any mention of the open investigation and instead only expressed concern that the dependency case has gone on for so long without any resolution or permanency.

218.   On or before April 10, 2006, in a decision that evidences an absolute failure to exercise professional judgment whatsoever, LACROIX closed the abuse report with no indicators of bruises/welts, simply stating that he referred Victim for an evaluation and assessment.

219.   In his Investigative Summary, LACROIX fell below the standard of care by omitting any resolution of the neglect allegations concerning the rash he observed on Victim's scalp, the finding that Victim did not appeared dirty and the allegation by her teacher that she had witnessed this on other occasions, and that Victim had been absent from school seventeen (17) times in just three (3) months.

220.   LACROIX also falsely reported in his summary that Victim's teacher and counselor were inconclusive about the allegation rather than the inconclusive nature being the result of Victim giving conflicting stories about where the injury occurred depending upon what setting she was in.

221.   LACROIX's failure to make collateral contacts to confirm or deny the Abusive Parents' claims, failure to conduct any follow-up, failure to notify CFCE or the GAL, and blatant omission and false representation of crucial facts and allegations in his investigative summary is egregious misconduct exposing SURVIVOR to a substantial risk of serious harm as he continued to reside in an abusive placement.

222.   According to all of CFCE's case notes and records, no case manager or supervisor was aware of SURVIVOR's school absences, the allegations made by the school in the 2006 abuse report, or that the Abusive Parents transferred SURVIVOR to a new school in the midst of those allegations and investigation.

223.   This lack of knowledge could only be the result of Defendant CFCE and WILLIAMS' complete failure to monitor SURVIVOR's educational progress with the school.

224.   CFCE, THEOC, and WILLIAMS failed to seek and/or obtain the assessments and therapy the psycho-educational evaluation that CPT recommended on closure of the investigation.

225.   Despite their constitutional, statutory, and contractual duties to ensure SURVIVOR's educational and psychological needs were being met and that he and his sister were in a safe and appropriate placement, CFCE and THEOC deliberately failed to learn of SURVIVOR's problems in school or the abuse report resulting there from in reckless disregard of SURVIVOR's safety and well-being.

37

226.    In or about April 2006, IBRAHIM was assigned as SURVIVOR's foster care case manager.

227.    IBRAHIM fell below the standard of care by not appropriately reviewing the file and assembling an accurate understanding of SURVIVOR and his sister's history of neglect, abuse and failure to receive medical and psychological services while in the home of Abusive Foster Parents.

228.    On April 19, 2006, the Abusive Parents inaccurately informed IBRAHIM that they never had any problems with the children in the two years they had been placed in the home.

229.    From March 2006 through November 2006, there were a series of inaccurate reports and/or false information provided to the court and the Citizen Review Panel ("CRP"), a panel composed of five (5) volunteers authorized by administrative order to review cases and provide the court with a report and recommendations regarding the placement and dispositional alternatives the court shall consider before issuing a judicial review order, regarding SURVIVOR's needs and the services, or lack thereof, being provided.

230.    Upon information and belief, SURVIVOR's GAL was misled by Defendants as well as the Abusive Parents into believing that SURVIVOR and his sister were receiving therapy at some point in time.

231.    On November 28, 2006, IBRAHIM erroneously reported to the Citizen Review Panel that SURVIVOR had been discharged from therapy, but could not report why or when.

232.    However, upon information and belief, SURVIVOR never received any type of therapy.

233.    On November 28, 2006, upon information and belief, SURVIVOR's GAL informed the CRP that SURVIVOR had poor grades in school as well as poor conduct marks.

38

234.    In response to the CRP's concerns regarding SURVIVOR's grades and conduct, IBRAHIM failed to determine that SURVIVOR's performance in school was deteriorating amd informed the panel that SURVIVOR will receive tutoring in the aftercare program at school.

235.    Upon information and belief, IBRAHIM represented this to the panel based solely upon the word of Abusive Mother, which was later demonstrated to be false, as the aftercare program did not provide tutoring.

236.    IBRAHIM took Abusive Mother's word regarding tutoring as every one of his home visit reports indicated SURVIVOR and his sister were doing well in school, which he now clearly knew was false.

237.    Accordingly, IBRAHIM either blatantly ignored the clear facts that the Abusive Parents were lying to him about how the children were doing in their care, which should have resulted in their removal or at least an investigation into the placement and the Abusive Parents' care license, or IBRAHIM knowingly assisted the Abusive Parents in perpetrating their deception.

238.    As a result of SURVIVOR's problems in school, the CRP recommended that CFCE, through IBRAHIM, have a staffing with the school to ensure that SURVIVOR was receiving tutoring.

239.    The CRP further instructed that if SURVIVOR did not make improvements, CFCE, through IBRAHIM, needed to request a psycho-educational evaluation and report documentation of tutoring progress and evaluation at the next review.

240.    Additionally, the CRP ordered that if SURVIVOR's behavioral problems did not improve, CFCE, through IBRAHIM, needed to contact the school to determine what behavioral services could be implemented and to report that outcome at the next review as well.

241.   Upon information and belief, CFCE and IBRAHIM failed to comply with any of the CRP recommendations to address SURVIVORS' emotional and educational deterioration.

242.   On December 7, 2006, Dr. Michael DiTomasso evaluated SURVIVOR and his sister to determine their ability to testify at their biological father's termination of parental rights trial.

243.   Dr. DiTomasso noted that the children were more hyperactive and less controlled than the last time he saw them, but attributed this to SURVIVOR not being at home in the presence of the Abusive Parents as he was the first time he evaluated him and his sister.

244.   Upon information and believe, CFCE and IBRAHIM did not provide Dr. DiTomasso with a complete history and educational records as he also reported that SURVIVOR and his sister were doing well academically and at home with no issues, despite clear evidence in the record and knowledge of all relevant parties that this was false.

245.   On March 7, 2007, just two (2) weeks prior to another abuse report from SURVIVOR's second school, IBRAHIM once again noted a home visit in which SURVIVOR and his sister were reportedly doing well in school and Abusive Mother was helping them with their homework.

246.   On March 20, 2007, SURVIVOR's school principal called in an abuse report alleging as follows:  1) for the past five (5) months, Victim went to school at least two to three times per week with serious body odor, smelling rotten, and appearing unkempt; 2) Victim's uniforms were not clean and her shoes were dirty; 3) on one occasion, Victim got apple sauce in her hair at school and returned to school the following day with it still in her hair; 4) Victim was always hungry and eats a lot at school, she hoards food in her backpack from breakfast and lunch, and there was concern that she was not eating at home;  5) she was afraid to talk; and, 6)

40

SURVIVOR also went to school appearing unkempt.

247. GUILLOT was the DCF CPI assigned to investigate this abuse report.

248. On the day the abuse report was received, GUILLOT printed the HomeSafenet Chronological Notes Report from the time SURVIVOR entered custody in March 2004 through that day.

249. Accordingly, GUILLOT had the entire history of case notes for SURVIVOR's time in care, including the 2006 Abuse Report case notes and the repeated home visit notes falsely indicating SURVIVOR and his sister were doing well both at school and at home.

250. On March 21, 2007, GUILLOT visited SURVIVOR's school and spoke with his principal, who confirmed the allegations of the report and expanded further, alleging the deteriorating condition of the SURVIVOR and his sister to include as follows:

    a.    In the beginning of the school year, Victim was always falling asleep in class, and one time she fell asleep and when her teacher said she was taking her to the office, Victim became hysterical crying, scared to go home. They could only calm her down by telling her that she would be able to remain at school, but Abusive Mother came and took her home anyway;

    b.    Abusive Mother informed her that another son went to therapy every Wednesday, so she consistently took SURVIVOR out of school early when she picked her other son up;

    c.    The children were failing and would be retained in the first grade;

    d.    Abusive Mother recently asked the teacher to punish Victim because she was not behaving at home;

    e.    There was no follow-up from the Abusive Mother in regards to helping the children;

    f.    Victim was being kept out of school on Fridays when she had her spelling tests; and

    g.    Victim appeared threatened or scared of Abusive Mother.

251. In addition to the above allegations, Ms. Marrero also informed GUILLOT that

she had never met SURVIVOR's caseworker, IBRAHIM, despite the fact that for the past year IBRAHIM had consistently documented that the children were doing well in school.

252.   GUILLOT went to the Abusive Parents' home to conduct face-to-face interviews, in which Abusive Mother denied all of the allegations, claiming that SURVIVOR and his sister were doing better at the beginning of the school year, but after they started going to court and speaking to a psychiatrist about the abuse, they began acting out.

253.   GUILLOT should have immediately questioned the veracity of Abusive Mother's claim in light of the school's allegations that SURVIVOR's and Victim's issues had been ongoing over the course of the previous five (5) months.

254.   Despite this obvious discrepancy, GUILLOT failed to conduct any follow-up with the school, the case manager, or any other relevant party to determine if Abusive Mother's excuse for SURVIVOR's issues was legitimate.

255.   Abusive Mother showed GUILLOT SURVIVOR's uniforms claiming that she washed them and SURVIVOR and Victim went to school clean every day.

256.   GUILLOT observes two shirts that appeared dingy and discolored and advised Abusive Mother to throw them away and buy new ones.

257.   Abusive Mother blamed SURVIVOR's poor performance on him being slow and having trouble with the work and blamed Victim's body odor on her medications and medical condition.

258.   GUILLOT failed to make further inquiries of the school as to whether SURVIVOR was in fact slow or suffering from some form of learning disability that was making achievement difficult for him.

259.   GUILLOT did not make contact with Victim's medical providers to find out

whether Abusive Mother's claim about Victim's body odor and hunger being caused by her medical condition was accurate.

260.   GUILLOT spoke to Victim at the home, and she denied all of the allegations.

261.   Upon information and belief, GUILLOT did not conduct a private interview with SURVIVOR or Victim, in direct contravention of professional standards and with gross disregard for their safety and well-being.

262.   On March 21, 2007, as part of her investigation, GUILLOT made collateral contact with providers for another child living in the Abusive Parents' home, but made no further contacts with regard to SURVIVOR or Victim.

263.   GUILLOT completed her "investigative" work in the first twenty-four (24) hours after receiving the abuse report, without conducting any follow-up or making any collateral contacts to ensure the children would be safe and free from harm.

264.   GUILLOT did not even attempt to get an adequate explanation from the Abusive Parents regarding SURVIVOR's excessive absences or early removals from school.

265.   On March 28, 2007, despite the very serious allegations being made by both the school principal and Victim's teacher evidencing that the SURVIVOR and his sister were deteriorating in the care of the Abusive Parents and the fact that the second school felt compelled to report potential abuse and neglect, without conducting any further investigation, GUILLOT abdicated responsibility for the case by referring it to a DCF lawyer, who based on wholly inadequate, incomplete and limited information from a partial investigation, concluded there was no legal sufficiency to shelter SURVIVOR.

266.   GUILLOT failed to notify SURVIVOR's GAL of the abuse allegations, and the GAL only became aware of the allegations because the school principal contacted him.

267. On March 29, 2007, while the abuse investigation was still open, SURVIVOR's GAL visited SURVIVOR's school and spoke with the principal, both SURVIVOR's and Victim's teachers, the school counselor, and the assistant principal, confirming the abuse report allegations, including that both children had been absent approximately twenty (20) days, taken out of school early about a dozen times, and were expected to be retained in the first grade.

268. By this time, SURVIVOR and his sister had been in care for three (3) years, despite statutory requirements of section 39.001(1)(h), Florida Statutes, that permanency be reached within one year.

269. GUILLOT did not make contact with SURVIVOR's case manager, IBRAHIM until April 3, 2007, a full two (2) weeks after the initial abuse report came in.

270. Upon information and belief, GUILLOT failed to inform IBRAHIM that SURVIVOR and his sister were failing the first grade, that they had excessive absences, or any of the major allegations made by the school regarding Victim's condition and apparent fear of Abusive Mother.

271. IBRAHIM did nothing but assure GUILLOT that SURVIVOR and his sister were being well cared for by the Abusive Parents without any further inquiries of his own, and upon information and belief, evidenced no concern whatsoever regarding these serious allegations.

272. Despite having the case notes in her possession, which clearly demonstrate that IBRAHIM was wholly unaware of any problems or issues with SURVIVOR, GUILLOT accepted IBRAHIM's assurances at face value and made no further inquiries on the matter.

273. On April 6, 2007, IBRAHIM completed a home visit and reported that the children are well cared for.

274. On April 12, 2007, GUILLOT closed the abuse report with no indicators of

44

environmental hazards.

275.    Based upon the information in her possession, GUILLOT's closure of the abuse report with no indicators was both erroneous and below the standard of care.

276.    In her investigative summary, GUILLOT fell below the standard of care and failed to consider and include the most serious allegations made by SURVIVOR's school, including SURVIVOR's failing grades, excessive absences, Victim's excessive hunger and hoarding of food or her apparent fear of Abusive Mother, indicating only that there was no evidence to support the allegation of environmental hazards based upon her observations of the home and the children's uniforms.

277.    Because the school notified SURVIVOR's GAL, the inquiries as to the SURVIVOR's well-being did not end with the abuse investigation.

278.    On April 13, 2007, in the midst of the GAL's independent investigation into the allegations and immediately after the abuse report was closed with no indicators, the CRP again expressed its concern regarding SURVIVOR's poor grades and behavior problems in school.

279.    In response to the CRP's concerns, Abusive Mother once again lied about SURVIVOR receiving tutoring in after school care and for the first time in the three (3) years since SURVIVOR had been in her care, then claimed that SURVIVOR needed an Individual Education Plan ("IEP") with a smaller classroom setting and that she had been working on trying to get this for him, but had run into delays.

280.    Abusive Mother also informed the CRP that Victim would be promoted from first grade, but that she acted up when she had to testify or talk about her biological father, that she did not need therapy despite the long history of recommendations that she receive it, and that the allegation regarding dirty uniforms was unfounded.

281.   The CRP instructed IBRAHIM to take Abusive Mother to SURVIVOR's school to assist in getting the IEP for SURVIVOR.

282.   Upon information and belief, IBRAHIM never went to the school as instructed and was deliberately indifferent to Survivor's educational and psychological needs as she was deteriorating in the care of Abusive Parents.

283.   The Abusive Parents also informed the CRP that SURVIVOR and his sister had never received therapy, despite IBRAHIM's earlier claims that they had been discharged from therapy.

284.   As a result of his findings and concerns, on May 11, 2007, the GAL requested an evidentiary hearing to determine the safety and appropriateness of SURVIVOR's placement.

285.   In response, the Abusive Parents wrote a letter of complaint about SURVIVOR's GAL.

286.   The fact that the Abusive Parents only began to complain about the GAL, who had been assigned to the case for over three (3) years, at the time when the GAL was the single person attempting to conduct an adequate investigation into the serious allegations against them, should have been an immediate red flag to all relevant parties, CFCE and IBRAHIM, who already knew that SURVIVOR and his sister were emotionally and educationally deteriorating in the Abusive Parents' home.

287.   On June 11, 2007, at the request of the GAL, Dr. Archer conducted another psychological evaluation of SURVIVOR to address his ability to testify and identify any treatment needs.

288.   Once again, OUR KIDS, CFCE, and IBRAHIM departed from the standard of care and failed to provide Dr. Vanessa Archer with 1) an appropriate history including all

46

chronological notes documenting the foregoing abuse and neglect by Abusive Parents; 2) the positive home study of the King family; 3) the Comprehensive Behavioral Health Assessment ("CBHA"); 4) the abuse reports; and 4) the critical concerns that existed regarding the Abusive Parents' placement, including the belatedly disclosed allegations of sexual abuse by Abusive Mother, the medical neglect allegations of the nurse practitioner, and concerns expressed by the school as to the children's excessive absences and failing grades, the Victim's dirty and unkempt appearance and excessive hunger, and the Victim's fear of the Abusive Parents.

289. CFCE, IBRAHIM and/or OUR KIDS deliberately and with gross disregard for SURVIVOR's well-being failed to provide Dr. Archer with any of this history, documentation and information necessary to ensure that Dr. Archer could conduct a proper assessment and reach a valid conclusion.

290. Nonetheless, Dr. Archer concluded that both SURVIVOR and his sister were suffering from depression, had thoughts of killing themselves, and had low self-esteem and attachment difficulties. Additionally, she determined that SURVIVOR had also developed a stuttering problem and Victim believed something terrible was going to happen to her.

291. As a result of her findings, Dr. Archer recommended that SURVIVOR not testify in open court and that the children receive individual therapy.

292. At this point in time, SURVIVOR and his sister had been identified as having significantly deteriorated in the custody of the Abusive Parents, developing a variety of issues, including but not limited to, hyperactivity and possible Attention Deficit Hyperactivity Disorder, Reactive Attachment Disorder, speech and cognitive process deficiencies, poor school performance, and ultimately depression and yet no services or treatment had ever been provided to them.

293.   It should have been patently obvious to IBRAHIM that SURVIVOR and his sister had become two very troubled children after being in the care of the Abusive Parents for three (3) years.

294.   IBRAHIM was deliberately indifferent to the serious psychological needs of the SURVIVOR and his sister and neither sought nor obtained the recommended therapy or treatment for SURVIVOR and his sister's depression.

295.   Despite Dr. Archer's findings, IBRAHIM not only did not take any action to ensure the safety and well-being of SURVIVOR, but rather continued to defend the Abusive Parents as good parents and an appropriate adoptive home in reckless disregard of a known substantial risk of serious harm at the hands of Abusive Parents.

296.   On August 3, 2007, the Court, IBRAHIM and CFCE heard testimony from SURVIVOR's school principal, Ms. Marrero, as well as his kindergarten teacher from his first elementary school, who both confirmed the serious allegations regarding the children failing, excessive absences and no follow through from Abusive Parents on correcting the problems, as well as Victim's falling asleep in class, hoarding food, scared to go home, and petrified of getting in trouble.

297.   However, the Court was not made aware of the medical neglect from 2004, the repeated lies perpetrated by the Abusive Parents, their failure to inform anyone of the 2006 abuse report at the time, or that the 2006 report included allegations of physical abuse.

298.   Additionally, since the GAL started investigating the issues and questioning the placement, the Abusive Parents had begun to make it impossible for the GAL to visit SURVIVOR at home, and because he had not been able to see the children for three 3 months, the court had to instruct the Abuse Parents to cease creating problems for the GAL.

48

299.   As a result of the concerns raised at the hearing, the court ordered psychological and psycho-educational evaluations for both SURVIVOR and his sister.

300.   From August through October 2007, the Abusive Parents continued to prevent the GAL from visiting SURVIVOR at their home while attempting to place the blame for the visitation issues on the GAL himself which should have in itself raised significant red flags concerning the Abusive Parents' fitness to foster and or adopt the SURVIVOR and his sister.

301.   Between March 2007 and October 2007, IBRAHIM continued to document that the children were well cared for and no concerns were noted for their health or safety.

302.   On October 3, 2007, just four (4) months after Dr. Archer reported that the children were suffering from depression and needed individual therapy and after confirmation that both children were retained in the first grade, both the Abusive Parents and IBRAHIM erroneously reported to the CRP that SURVIVOR did not have a need for therapy.

303.   On October 3, 2007, the CRP expressed concern that despite the Court ordering evaluations two (2) months prior, no such evaluations had been completed.

304.   In response, IBRAHIM justified the failure by falsely alleging that the evaluation conducted by Dr. Archer in June 2007 at the GAL's request should be sufficient but that he had been unable to obtain it from the biological father's defense lawyer in his criminal proceedings.

305.   On October 9, 2007, the Miami-Dade County School Multi-Disciplinary Team filed its evaluation of SURVIVOR, concluding that despite having an average IQ and other functions, he had deficits across the board in all academic areas and needed to be referred to the M-Team for further consideration and disposition.

306.   On October 19, 2007, IBRAHIM claimed that he made referrals for Dr. Archer to reevaluate SURVIVOR, but that she was not willing to do another evaluation given she had just

done one in June.

307. However, the GAL pointed out that her prior evaluation was with regard to SURVIVOR's ability to testify and identify treatment needs, not with regard to placement.

308. Additionally, IBRAHIM claimed that Victim's psycho-educational evaluation had not been done because the school claimed she was doing better.

309. On or about November 14, 2007, CFCE transferred SURVIVOR's case from its foster care case unit to the adoption case unit.

310. This transfer was made despite the IBRAHIM and CFCE's knowledge that SURVIVOR and Victim were deteriorating emotionally and educationally in Abusive Parents' home.

311. Upon case transfer, IBRAHIM was replaced with adoption case manager, THEOC, who had previously been the case manager assigned to SURVIVOR and Victim's case and therefore, in addition to her duty to review the case file upon being assigned the case as an adoption case manager, knew or should have known of the prior concerns for the children's safety in the Abusive Parents' home.

312. Upon information and belief, CFCE did not appropriately assemble a complete history concerning the SURVIVOR and his sister and did not conduct a case transfer meeting or review between IBRAHIM and THEOC to ensure that she had all necessary additional information regarding the key events and recommendations in SURVIVOR's case described above.

313. On November 28, 2007, the dependency judge spoke with SURVIVOR and his sister and observed that Victim was very hyper. She ordered that psychological evaluations be done by Dr. Archer with regard to placement.

314.   On December 3, 2007, the Miami-Dade County School Multi-Disciplinary Team filed its report on Victim, concluding that unlike SURVIVOR, she did not exhibit a significant discrepancy between her IQ and academic achievement scores on testing.   They also recommended that she be referred to the M-Team for further consideration and disposition.

315.   As Victim did not display any learning deficiencies, her failure of the first grade was a clear red flag that she was not receiving proper care in the Abusive Parents' home or was otherwise suffering from psychological or emotional issues that prevented her from achieving commensurate with her abilities.

316.   At the time that CFCE transferred SURVIVOR's case to the adoption unit in November 2007, FRANCOIS, the adoption supervisor, informed THEOC that she needed to visit the home as soon as possible to introduce herself and update the status of adoption.

317.   However, THEOC was unable to make contact with the Abusive Parents' to conduct a home visit, despite attempting two unannounced visits, upon discovering that their phone number had been disconnected.

318.   Accordingly, on December 18, 2007, THEOC visited SURVIVOR and Victim at their school instead, reporting that they were in very good condition.

319.   THEOC obtained a phone number from SURVIVOR's school, but as of December 20, 2007, she had not received a return call from the Abusive Parents.

320.   On January 14, 2008, THEOC informed the CRP that SURVIVOR did not need therapy in direct contravention of all prior professional recommendations and with deliberate indifference to his serious psychological needs.

321.   On January 17, 2008, the Abusive Parents attempted to submit a taped message from the GAL as purported evidence that he committed perjury and was the one responsible for

51

all of the problems being raised.

322.   This attempt by the Abusive Parents to attack and blame the GAL, when the problems being raised were matters such as the children being depressed and failing school, should have immediately alerted THEOC and FRANCOIS that the Abusive Parents were unfit to care for and adopt the children.

323.   On February 4, 2008, FRANCOIS conducted a supervisory review with THEOC, in which THEOC reported that neither she nor the Abusive Parents "reported any concerns and/or issues related to the children's safety, placement, well-being, and permanency goal," but the Abusive Parents were concerned about interference from the GAL regarding their genuine interest and desire to adopt SURVIVOR and his sister.

324.   On February 15, 2008, six (6) months after the court ordered the evaluation in August, 2007, and nearly three months after it ordered it again in November, 2007, Dr. Archer completed her evaluation regarding SURVIVOR's placement, recommending that adoption by the Abusive Parents was appropriate.

325.   This recommendation could only have been made as result of Dr. Archer not being provided the evidence that SURVIVOR and his sister were neglected, abused. And had significantly deteriorated while in the Abusive Parents' care.

326.   In making this recommendation, Dr. Archer consulted only with Abusive Mother and reviewed no additional records.

327.   THEOC failed to provide Dr. Archer with any records or information about the serious abuse and neglect allegations that led the Court to order the evaluation in the first place to ensure that Dr. Archer had the necessary information to formulate a valid conclusion.

328.   Once again, OUR KIDS, CFCE, and THEOC departed from the standard of care

and failed to provide Dr. Vanessa Archer with 1) an appropriate history; 2) the positive home study of the King family; 3) the Comprehensive Behavioral Health Assessment ("CBHA"); 4) the abuse reports; and 4) the critical concerns that existed regarding the placement with Abusive Parents, including the belatedly disclosed allegations of sexual abuse by Abusive Mother  and the medical neglect allegations of the nurse practitioner; and 5) the additional neglect and abuse information not contained in the abuse reports, but certainly in the school records.

329.   OUR KIDS, CFCE, and THEOC deliberately and with gross disregard for SURVIVOR's well-being failed to provide Dr. Archer with any of this documentation and information necessary to ensuring that Dr. Archer could conduct a proper assessment and reach a valid conclusion.

330.   As such, Dr. Archer did not receive and failed to review critical information, including the 2005 allegation of medical neglect, the allegations SURVIVOR and his sister were retained in the first grade, appeared terrified of Abusive Mother, and were consistently tired, hungry, and dirty, and other material historical information reflecting that they were neglected, abused and deteriorated emotionally and educationally while in Abusive Parents' home.

331.   OUR KIDS, CFCE, and THEOC also completely disregarded Dr. Archer's prior diagnosis that SURVIVOR and his sister were suffering from depression in June 2007.

332.   THEOC not only failed to take any steps to ensure that Dr. Archer's report was accurate, but upon information and belief, actually assisted the Abusive Parents in ensuring that the report would have a favorable outcome for the adoption by deliberately excluding detrimental information from Dr. Archer's review.

333.   On February 16, 2008, CFCE documented that the children appeared to be "healthy and well-nourished and in very good physical, emotional, and mental condition" and

that "no additional services are needed at this time."

334.   Because of the Defendants' failure to provide accurate information to Dr. Archer, on February 22, 2008, CFCE and/or THEOC reported to the Court that they had submitted a very glowing psychological report from Dr. Archer regarding placement.

335.   The hearing on February 22, 2008 was originally set to address the Abusive Parents' prior allegations regarding the GAL's perjury, but they did not appear at the hearing.

336.   CFCE and THEOC reported to the Court that the Abusive Parents had decided not to press the issue and only wished to move forward with the adoption.

337.   Upon information and belief, THEOC and the Abusive Parents knew in advance of the hearing that Dr. Archer's report would be well received by the Court and resolve the issue of placement, such that they colluded in advance to no longer pursue their attack on SURVIVOR's GAL.

338.   On March 12, 2008, CFCE provided the Abusive Parents with the adoption application packet and the new case manager documented that she needed to follow-up with the previous case manager in regards to therapy for the children.

339.   By March 2008, SURVIVOR and his sister had been in care for four (4) years, despite statutory requirements of section 39.001(1)(h), Florida Statutes, that permanency be reached within one year.

340.   In July 2008, THEOC advised the Abusive Parents to begin completing the adoption package without dating the documents, since the biological father's appeal of his termination of parental rights was still pending.

341.   On July 8, 2008, THEOC documented that the children are doing "very well," that "no issues or concerns were noted," and that "the children are appropriately placed."

342. On August 8, 2008, the CRP again expressed its concern about Victim not receiving therapy and instructed CFCE to refer her for therapy which would have likely revealed serious concerns about the pending adoption by the Abusive Parents.

343. Upon information and belief, THEOC failed to complete the referral as instructed or obtain any therapy for Victim or SURVIVOR as previously recommended.

344. Even as SURVIVOR's case began to move through the final stages of adoption, there were a series of additional red flags that were both placated or ignored by THEOC and FRANCOIS.

345. On June 16, 2008, THEOC attempted to conduct her scheduled home visit, but the Abusive Parents were not at home.

346. On September 5, 2008, FRANCOIS noted in her supervisory review that THEOC completed the safety plan requested by DCF and OUR KIDS. However, nothing in the record indicates the reason for the safety plan or when it was requested.

347. Additionally, FRANCOIS noted that THEOC needed to continue to closely monitor developments in the case to ensure that any issues or concerns were promptly resolved.

348. However, nothing in the record indicates what precipitated this instruction as THEOC consistently and repeatedly noted that SURVIVOR and his sister were doing well in the Abusive Parents' home and reported no problems.

349. On October 3, 2008, FRANCOIS noted in her supervisory review that the Abusive Parents continued to express concerns regarding the GAL, who had been removed from SURVIVOR's case months prior, stating that they felt he was responsible for the delays in adoption by seeking out unqualified out-of-state relatives who were not interested in providing permanency for the children.

55

350.   The concern expressed by the Abusive Parents was clearly false and contrary to every fact contained in SURVIVOR's case file.

351.   However, neither FRANCOIS nor THEOC took any action or made any further inquiries into why the Abusive Parents would continue to lie about SURVIVOR's GAL at this stage.

352.   On October 7, 2008, FRANCOIS noted that the biological father's appeal was over and SURVIVOR and his sister were free for adoption, so to instruct the Abusive Parents to complete the adoption package.

353.   On November 3, 2008, FRANCOIS noted in her supervisory review that Victim had missed about seven (7) days of school in October due to her medical condition, but that the Abusive Parents had failed to provide the school with documentation from her physician so that the absences could be properly excused.

354.   FRANCOIS also noted that despite being told to complete the adoption package as quickly as possible (and having had it in their possession for many months) so as to finalize on National Adoption Day in November, the Abusive Parents had not completed their tasks.

355.   In her adoption status report to the Court dated November 13, 2008, THEOC noted that while the Abusive Parents had completed a majority of the adoption package, they claimed they could not get an appointment for SURVIVOR's updated physical until late November.

356.   On December 5, 2008, FRANCOIS noted in her supervisory review that the Abusive Parents were still working on the adoption package and seemed to have become less enthusiastic about providing documents in a timely manner.

357.   FRANCOIS instructed THEOC to continue to monitor the Abusive Parents'

compliance in order for CFCE to determine whether it would be necessary for the Court to communicate the urgency and importance of getting the tasks completed to the Abusive Parents.

358.   On December 8, 2008, Abusive Mother informed THEOC that her failure to get updated physicals for SURVIVOR was a result of the GAL incorrectly advising her that the physical had to be done within thirty (30) days of the adoption, so she rescheduled her appointment from November to January 2009.

359.   The process of delays regarding the SURVIVOR's physical and Abusive Mother making excuses and perpetrating lies to both the GAL and THEOC regarding the reasons for the delays in the adoption process continued through May 2009.

360.   In light of the Abusive Parents' history in pushing for adoption of the SURVIVOR and blaming delays on the GAL, the Abusive Parents' failure to complete the adoption package for over one (1) year from being provided with it and seven (7) months from the time SURVIVOR and his sister were freed for adoption should have sounded the alarms about their fitness to adopt.

361.   However, with reckless and deliberate disregard of Plaintiff's safety and well-being, FRANCOIS and THEOC did nothing.

362.   On May 29, 2009, SURVIVOR's and Victim's adoption by the Abusive Parents was finalized.

363.   Upon information and belief, despite Victim's serious medical condition, SURVIVOR's alleged learning disabilities, and their history of recommended treatment and therapy, OUR KIDS, CFCE, FRANCOIS and THEOC failed to offer or provide the Abusive Parents with post-adoption services.

364.   As a proximate result of the Defendants' acts and omissions described above,

SURVIVOR and Victim were adopted by Abusive Parents even though they had been neglected and abused in foster care in excess of five (5) years.

365.   Because OUR KIDS takes no direct responsibility and supervision of all of the children in its legal care and custody, it has consistently had one of the longest average lengths of stay in foster care amongst all of the lead agencies in the State of Florida.

366.   Post-adoption, the degree and nature of SURVIVOR's abuse and neglect escalated, because the Abusive Parents no longer had to concern themselves with regular monitoring of their home by the Court and the GAL.

367.   In June 2010, SURVIVOR's school once again called the Abuse Hotline to report allegations of abuse and neglect.

368.   As with previous abuse reports, the investigation failed to uncover the horrible abuse SURVIVOR and his sister were enduring in the Abusive Parents' home and was closed with no indicators.

369.   After that abuse report, the Abusive Parents removed SURVIVOR from the public school system entirely, alleging they were going to home school the children.

370.   In February 2011, the Abuse Hotline received yet another abuse report, this time alleging that SURVIVOR and his sister were being severely abused and imprisoned from the world.

371.   In February 2011, SURVIVOR and Victim were Victim was found deceased, having been murdered by the Abusive Parent(s), and SURVIVOR was severely injured and near death as well.

<u>COUNT I - 42 U.S.C. §1983 CLAIM AGAINST<br>LACHERYL HARRIS f/k/a LACHERYL ALVARADO</u>

372.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-371 of

as if fully set forth herein.

373.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of Plaintiff's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

374.   At all times relevant hereto, HARRIS, as the Family Services Counselor, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

375.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

376.   At all times material hereto, HARRIS was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

377.   HARRIS violated SURVIVOR's Constitutional and federal rights as follows:

a.      She failed to initiate the ICPC for five (5) months despite knowing that relatives were willing and eager to care for SURVIVOR and after having been ordered by the dependency court to do so with deliberate indifference to SURVIVOR's right to be placed with relatives;

b.      Despite receiving the completed ICPC home study with a positive result, she continued to inform the Court that it had not been received or completed for three (3) months after it was in fact completed and over one (1) month after clear evidence of its receipt.

c.      By the time the ICPC was completed and the court informed, SURVIVOR

had been in the Abusive Parents' home for seventeen (17) months.

        d.     As a result of the needless and incxcusable delays, SURVIVOR was denied his right to be placed with his family out-of-state.

        e.     She failed to ensure the CBHA, a crucial assessment as outlined in Rule § 65C-28.014 of the Florida Administrative Code and DCF Operating Procedure 155-10, became a part of SURVIVOR's permanent case file, such that no future caseworker, medical, psychological, or educational provider had it available for accurate and complete evaluations of SURVIVOR's needs with deliberate indifference to his safety and well-being;

        f.     Despite the CBHA recommendation that Victim receive play therapy and the subsequent court order that both SURVIVOR and his sister receive said therapy, she deliberately failed to take any action to secure said treatment for five (5) months with reckless disregard for SURVIVOR 's psychological needs;

        g.     After finally initiating a referral for services, she recklessly failed to ensure that the provider had SURVIVOR's background, history, or the CBHA, which would have identified the basis for recommending play therapy, and as a result, the provider concluded SURVIVOR did not meet the requirements for therapy based solely upon the inaccurate and incomplete information provided by Abusive Mother;

        h.     She took no further action to correct or supplement the provider's evaluation, and as such, SURVIVOR never received therapy in deliberate disregard for his needs and well-being;

        i.     She failed to seek any evaluations or assessments of SURVIVOR after the Abusive Parents raised serious concerns regarding sexual abuse by his biological father in reckless disregard for his safety and well-being and in direct contravention of DCF operating

procedures;

j.      Either she knew early on that SURVIVOR and his sister were demonstrating behavioral issues, including the Victim appearing sexualized, and that visitations with the biological father were potentially harming SURVIVOR but did nothing about it or she knew the Abusive Parents were not a safe and appropriate placement because they fabricated the information and lied about having informed her with deliberate indifference to SURVIVOR's safety and in direct contravention to DCF operating procedures;

k.      Despite the medical neglect allegations made by the children's nurse in December 2004, she failed to make a mandatory report to the abuse hotline and took no action whatsoever to ensure SURVIVOR was in a safe and appropriate foster home with deliberate indifference to his safety;

l.      Despite reports of an apparently new speech problem as well as the continued behavioral difficulties resulting from the alleged sexual abuse, she failed to seek or obtain any therapeutic evaluations or treatment for SURVIVOR in deliberate disregard of his psychological needs;

m.      Additionally, if the speech problems only arose one year after being in the Abusive Parents' care, she deliberately and/or recklessly failed to make any further inquiries or conduct any investigation into the cause for those problems and whether it was a result of abuse or neglect in the  Abusive Parents' home with deliberate indifference to SURVIVOR's safety; and,

n.      She failed to ensure that necessary medical and dental care was provided at all times while SURVIVOR was in the custody of the State and was deliberately indifferent to his serious medical and/or psychological needs.

378.   HARRIS took said actions knowing SURVIVOR would be exposed to a substantial risk of serious harm.

379.   Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, HARRIS was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR was safe in the Abusive Parents' home and that he received all necessary treatment and services.

380.   HARRIS' deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of the allegations and harm set forth above including SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

381.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against HARRIS for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT II - 42 U.S.C. §1983 CLAIM AGAINST ALICIA PROFF

382.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-371 as if fully set forth herein.

383.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

384.   At all times relevant hereto, PROFF, as the Family Services Supervisor, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

385.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

386.   At all times material hereto, PROFF was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

387.   At all times relevant hereto, PROFF was obligated to know the contents of SURVIVOR's case file and conduct monthly supervisory reviews with HARRIS, providing direction and guidance regarding necessary tasks, including without limitation, making necessary referrals for medical and psychological assessments and treatment, investigating the foster home when questions of SURVIVOR's safety arose, ensuring information provided to the Court and other relevant providers and evaluators was truthful and accurate, and any and all other necessary actions to ensure SURVIVOR's health, safety, and well-being while in care.

388.   PROFF violated SURVIVOR's Constitutional and federal rights as follows:

a.   She failed to assign a family services counselor to initiate the ICPC for nearly one (1) month despite knowing that relatives were willing and eager to care for SURVIVOR and after having notified the Court that it had already been done with deliberate disregard for SURVIVOR's right to be placed with relatives;

b.   She failed to ensure that the family services counselor initiated the ICPC for five (5) months despite knowing that relatives were willing and eager to care for SURVIVOR

and after having been ordered by the dependency court to do so with deliberate disregard for SURVIVOR's right to be placed with relatives;

      c.    Despite receiving the completed ICPC home study with a positive result, she recklessly continued to inform the Court that it had not been received or completed for three (3) months after it was in fact completed and over one (1) month after clear evidence of its receipt.  By the time the ICPC was completed and the court informed, SURVIVOR had been in the Abusive Parents' home for seventeen (17) months.   As a result of the needless and inexcusable delays, SURVIVOR was denied their right to be placed with his family.

      d.    She failed to ensure the CBHA, a crucial assessment as outlined in Rule § 65C-28.014 of the Florida Administrative Code and DCF Operating Procedure 155-10, became a part of SURVIVOR's permanent case file, such that no future caseworker, medical, psychological, or educational provider had it available for accurate and complete evaluations of SURVIVOR's needs with deliberate indifference to their safety and well-being;

      e.    Despite the CBHA recommendation that Victim receive play therapy and the subsequent court order that both SURVIVOR and his sister receive said therapy, she deliberately failed to take any action or ensure HARRIS took any action to secure said treatment for five (5) months in deliberate disregard of SURVIVOR's psychological needs;

      f.    She made no effort to ensure that HARRIS provided the evaluator with SURVIVOR's background, history, or the CBHA, which would have identified the basis for recommending play therapy, and as a result, the provider concluded SURVIVOR did not meet the requirements for therapy based solely upon the inaccurate and incomplete information provided by Abusive Mother in reckless disregard for SURVIVOR's health and well-being;

      g.    She took no further action and/or failed to ensure HARRIS took action to

correct or supplement the provider's evaluation, and as such, SURVIVOR never received therapy with deliberate indifference to SURVIVOR's psychological needs.

       h.     She failed to seek any evaluations or assessments of SURVIVOR and/or failed to ensure HARRIS sought an evaluation or assessment after the Abusive Parents raised serious concerns regarding sexual abuse by their biological father in reckless disregard of SURVIVOR's needs and safety and DCF operating procedures;

       i.     Either she knew early on that SURVIVOR was demonstrating behavioral issues, including Victim appearing sexualized, and that visitations with the biological father were potentially harming SURVIVOR but did nothing about it or she knew the Abusive Parents were not in a safe and appropriate placement because they fabricated the information and lied about having informed HARRIS with deliberate indifference to SURVIVOR's safety and well-being and DCF operating procedures;

       j.     Despite the medical neglect allegations made by the children's nurse in December 2004, she failed to make a mandatory report, failed to ensure HARRIS made the mandatory report, and/or failed to take any action whatsoever to ensure SURVIVOR was in a safe and appropriate foster home with deliberate indifference to SURVIVOR's safety;

       k.     Despite reports of an apparently new speech problem as well as the continued behavioral difficulties resulting from the alleged sexual abuse, she failed to ensure HARRIS sought or obtained any therapeutic evaluations or treatment for SURVIVOR with deliberate indifference to SURVIVOR's psychological needs;

       l.     Additionally, if the speech problems only arose one year after being in the Abusive Parents' care, she failed to make any further inquiries or conduct any investigation or ensure that HARRIS made such inquiries into the cause for those problems and whether it was a

result of abuse or neglect in the Abusive Parents' home in reckless disregard of SURVIVOR's safety; and,

   m. She failed to ensure that necessary medical and dental were provided at all times while SURVIVOR was in the custody of the State and was deliberately indifferent to his serious medical and/or psychological needs.

  389. PROFF took said actions knowing SURVIVOR would be exposed to a substantial risk of serious harm.

  390. Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, PROFF was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR received all necessary treatment and services.

  391. PROFF's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and  trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

  392. SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

  WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against PROFF for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT III - 42 U.S.C. §1983 CLAIM AGAINST JEAN LACROIX

  393. Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-19 and

182-371 of the general allegations above as if fully set forth herein.

394.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

395.   At all times relevant hereto, LACROIX, as a Child Protective Investigator, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

396.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

397.   At all times material hereto, LACROIX was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

398.   LACROIX violated SURVIVOR's Constitutional and federal rights as follows:

a.   He failed to interview SURVIVOR privately and outside the presence of the Abusive Parents or school officials in direct contravention of professional standards and with deliberate disregard for SURVIVOR's safety;

b.   He recklessly failed to ensure that Victim was seen by CPT in a timely manner, such that CPT did not conduct its assessment until eleven (11) days after the abuse report came in, thereby ensuring that the bruises would be gone or significantly healed and that the Abusive Parents would have ample time to ensure she appeared clean and well care for with deliberate indifference to SURVIVOR's safety and well-being;

67

c.    He failed to ensure that CPT had accurate and complete information regarding the circumstances of the bruise, the manner in which Victim changed her story, and her unclean appearance and scalp problem;

d.    He failed to ensure that the Abusive Parents followed through with obtaining the psycho-educational evaluation recommended by CPT;

e.    He recklessly relied solely upon CPT's finding that this was not a case of child abuse, with deliberate disregard for SURVIVOR's safety despite the length of time that elapsed between the report and their assessment and his own observations and in direct contravention of professional standards and DCF operating procedure, which indicates that CPT reports are only to be taken into consideration in making a determination;

f.    He failed to add maltreatment allegations to the abuse report after having observed clear signs of neglect in direct contravention to his statutory duties and DCF operating procedures;

g.    He deliberately failed to learn that just eight (8) days after the abuse report came in and prior to CPT ever examining Victim, the Abusive Parents removed SURVIVOR and his sister from the elementary school responsible for making the report;

h.    He failed to make necessary and required collateral contacts as required by Rule 65C-29.004(17), including without limitation, Victim's medical provider to determine whether her scalp condition was a result of her medications as the Abusive Parents claimed;

i.    He failed to notify SURVIVOR's case manager or GAL of the abuse investigation as required by Rule 65C-29.004(4)(l)-(m) and as instructed by a second-party reviewer, both of whom also would have been in a position and had a duty to ensure that Victim received the psycho-educational evaluation recommended by CPT;

j.    He failed to remove SURVIVOR from the Abusive Parents' home as required by DCF procedures and then closed the report with no indicators, despite the high risk and the known substantial risk of harm after confirming Victim's large bruise on her chin and neck as well as other marks on her back, that she could not adequately explain precisely how she received her injuries, that she changed her story about when and where the injury occurred depending on whether she was at school or at home, that she appeared unclean and had not been bathed, had a rash on her scalp, and had an inordinate number of absences from school; and,

k.    He omitted crucial information from his investigative summary and falsely reported that the teacher and counselor were inconclusive about the allegations.

399.   LACROIX took said actions knowing SURVIVOR would be exposes to a substantial risk of harm.

400.   Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, LACROIX was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR received all necessary treatment and services.

401.   LACROIX's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

402.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against LACROIX for all recoverable damages, attorney's fees and costs,

and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IV - 42 U.S.C. §1983 CLAIM AGAINST EUNICE GUILLOT

403.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 20-23 and 246-371 of the general allegations above as if fully set forth herein.

404.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

405.   At all times relevant hereto, GUILLOT, as a Child Protective Investigator, was acting under color of state law and was acting or purporting to act in the performance of her official duties.

406.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

407.   At all times material hereto, GUILLOT was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

408.   GUILLOT violated SURVIVOR's Constitutional and federal rights as follows:

a.      She failed to interview SURVIVOR privately and outside the presence of the Abusive Parents or school officials in direct contravention of professional standards;

b.      She failed to make necessary and required collateral contacts as required by Rule 65C-29.004(17), including without limitation, Victim's medical provider to determine whether her body odor and hunger was a result of her medical condition, SURVIVOR's school to

70

make further inquiries as to whether SURVIVOR was in fact slow or suffering some form of learning disability, and SURVIVOR's case manager to discuss whether the legal process could be a contributing factor to SURVIVOR's poor school performance as the Abusive Parents claimed;

       c.     She failed to notify SURVIVOR's case manager of the abuse investigation as required by Rule 65C-29.004(4)(l)-(m) in a timely manner, and even when she did, she failed to inform him of the most serious allegations;

       d.     She failed to notify SURVIVOR's GAL of the abuse investigation as required by Rule 65C-29.004(4)(l)-(m);

       e.     She failed to consider or review the previous abuse report in 2006 in direct contravention of her statutory and professional duties, which would have revealed similar allegations had been made by a wholly different school, which would have given even more cause to confirm abuse and neglect in this instance;

       f.     She failed to remove SURVIVOR from the Abusive Parents' home and closed the report with no indicators, despite a known substantial risk of harm after confirming SURVIVOR and his sister were failing the first grade, that they had an inordinate and inexcusable number of absences and early withdrawals from school, that the children were falling asleep in class regularly, that Victim hoarded food and became hysterical at the prospect of getting in trouble with Abusive Mother, and after being told by numerous school professionals that Victim appeared terrified of her Abusive Mother, who gave very specific examples to justify the claim without obtaining any confirmed or corroborated explanation other than the Abusive Parents' word and assurances from a case manager who was not even aware of the SURVIVOR's difficulties until notified of the abuse report;

       g.     She omitted crucial information from her investigative summary, including

the most serious allegations, including without limitation, SURVIVOR's failing grades, excessive absences, Victim's excessive hunger and hoarding of food or her apparent fear of Abusive Mother, indicating only that there was no evidence to support the allegation of environmental hazards based upon her observations of the home and children's uniforms;

409.   GUILLOT took said actions with knowledge that SURVIVOR was exposed to a substantial risk of serious harm.

410.   Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, GUILLOT was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR received all necessary treatment and services.

411.   GUILLOT's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

412.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against GUILLOT for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT V - 42 U.S.C. §1983 CLAIM AGAINST
## OUR KIDS, INC

413.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53, and 132-371 of the general allegations above as if fully set forth herein.

414.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the

72

deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

415.   At all times relevant hereto, OUR KIDS was a "person" and was acting under color of state law within the meaning of 42 U.S.C. §1983.

416.   At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

417.   Pursuant to § 409.1671, Florida Statutes, DCF delegated responsibility for providing foster care and related services to lead agencies, which are defined both in the statute and the contract with DCF as the not-for-profit community-based care agency responsible for coordinating, integrating and managing a local system of supports and services for children.

418.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

419.   Although § 409.1671 grants lead agencies such as OUR KIDS the authority to enter into subcontracts for specific services, it cannot and does not permit OUR KIDS to delegate their Constitutional and statutory duties to ensure the safety and well-being of each child in its care.

420.   As such, and at all relevant time hereto, OUR KIDS had a constitutional, statutory, and non-delegable duty to ensure the health, welfare, and safety of each child in its custody.

421.   OUR KIDS violated SURVIVOR's Constitutional rights as follows:

     a.    OUR KIDS failed to implement an appropriate policy to ensure

completion of the established transfer checklist for SURVIVOR and all children to whom it would become responsible for the provision of foster care services and thus failed to request crucial records and documentation to ensure SURVIVOR's continuity of care and continued receipt of necessary care and services, including without limitation, the CBHA, birth certificates, chronological case notes, and abuse reports;

   b.  OUR KIDS failed to ensure receipt of those crucial and necessary case file records in advance of accepting transfer of the case from DCF and prior to assigning the case to CFCE, knowing that a lack of adequate information and documentation in a case file poses a serious risk of harm to children in its care and with reckless disregard for SURVIVOR's safety and well-being;

   c.  OUR KIDS failed to establish a policy to conduct interviews with all appropriate persons involved in the lives of foster children, including either before or immediately after accepting responsibility as the lead agency for all of the children in its care and custody, including the SURVIVOR and his sister, with knowledge that such interviews are a crucial and necessary step to ensuring the safety of children in its care;

   d.  As a direct result of these customs, policies, or practices, SURVIVOR was not enrolled in elementary school until three (3) months into the school year in reckless disregard of his educational needs and he continued to languish without recommended psychological therapies and treatment;

   e.  OUR KIDS subcontracted out all case management responsibilities and enforced customs, policies, or practices in which no one regularly and/or periodically reviewed the safety and care of each child placed in its custody, including the SURVIVOR and his sister, in deliberate and reckless disregard of its constitutional and statutory obligations;

   f.  OUR KIDS established and enforced customs, policies, and/or practices which resulted in allowing their subcontractors, in this case CFCE, to assume case management responsibilities without having the requisite documentation and without conducting a case transfer review or staffing at least between the relevant case managers to ensure that the new case manager would have all necessary background and information about SURVIVOR's case, placement, and then current needs;

   g.  OUR KIDS established and enforced customs, policies, and/or practices in which neither OUR KIDS nor CFCE was required to conduct any form of intake, staffing, assessment, or review to determine SURVIVOR's then current needs upon assuming responsibility for his care;

   h.  OUR KIDS established and enforced customs, policies, and/or practices in which they failed to adhere to professional standards by not interviewing the critical participants in the dependency case, including but not limited to, the GAL, Abusive Parents, school employees, and any other relevant parties to establish a baseline of knowledge about each child's well-being upon assuming responsibility for their care;

   i.  OUR KIDS established and enforced customs, policies, and/or practices in which OUR KIDS illegally and unconstitutionally relinquished all non-delegable duties and responsibilities to their subcontractors, in this case CFCE, such that OUR KIDS provided no direct supervision over those agencies or the case managers in complete dereliction of their constitutional, statutory, and contractual duty to ensure the health, safety, and well-being of each child in their care;

   j.  OUR KIDS established policies and customs that permitted foster children to remain in care far longer than the recommended time period required by section 39.001(1)(h),

Florida Statutes, including allowing the SURVIVOR and his sister to remain in care for over five (5) years while their mental health and educational conditions deteriorated.

k.      OUR KIDS established and enforced customs, policies, and/or practices whereby the only role OUR KIDS played in the provision of foster care services was to conduct quarterly quality assurance monitoring of their subcontractors' performance by sampling only 100 cases per quarter while serving thousands of children, in complete dereliction of their constitutional, statutory, and contractual duty to ensure the health, safety, and well-being of each child in their care;

l.      OUR KIDS established and enforced customs, policies, and/or practices whereby there was no uniform standard of care for case management or direct accountability for failures in each and every case, with each subcontractor operating under its own internal set of rules and procedures;

m.      OUR KIDS established and enforced customs, policies, and/or practices resulting in a standard of care that was based upon organizational measurements rather than client-centered outcomes, such that no one from OUR KIDS was ensuring that case managers were actually ensuring that children's needs were being met and that they were in safe placements;

n.      OUR KIDS established and enforced customs, policies, and/or practices whereby OUR KIDS retains the responsibility of approving or denying adoption packages despite having no direct involvement or supervision over each child's case, such as SURVIVOR;

o.      OUR KIDS established and enforced customs, policies, and/or practices resulting in the focus of performance being on achievement of administrative tasks and artificial productivity benchmarks rather than standardization of care, the quality of child welfare services

76

being provided, and the safety of children in their care;

        p.     OUR KIDS established and enforced customs, policies, and/or practices resulting in performing child welfare services ranked amongst the poorest performing lead agencies in performance of their duties in Florida;

        q.     OUR KIDS established and enforced customs, policies, and/or practices which resulted in children regularly failing to receive necessary medical, dental, and mental health services, such as SURVIVOR;

        r.     OUR KIDS established and enforced customs, policies, and/or practices which resulted in supervisors regularly failing to conduct supervisory reviews or when such reviews were conducted, failing to actually provide guidance and direction to the case managers, such as occurred in this case;

        s.     OUR KIDS established and enforced customs, policies, and/or practices which resulted case managers regularly failing to monitor children's educational progress to determine whether educational needs were being met and failing to meet those needs, such as occurred in this case;

        t.     OUR KIDS established and enforced customs, policies, and/or practices in which no one person was directly responsible for ensuring that each individual involved in a child's case shared and had access to all pertinent case-related information, including allegations of abuse, such as occurred in this case;

422.   OUR KIDS took said actions knowing it was exposing children who were in State custody, including SURVIVOR, to a substantial risk of serious harm.

423.   Despite possessing the authority and means to remedy the unconstitutional treatment of SURVIVOR, OUR KIDS was deliberately indifferent and/or recklessly failed to

take immediate action to ensure that SURVIVOR and other dependent children like him received all necessary treatment and services and were not harmed while in State custody.

424.   OUR KIDS' deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

425.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against OUR KIDS and for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VI - 42 U.S.C. §1983 CLAIM AGAINST THE CENTER FOR FAMILY AND CHILD ENRICHMENT

426.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 32-53, and 132-371 of the allegations above as if fully set forth herein.

427.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

428.   At all times relevant hereto, CFCE was a "person" and was acting under color of state law within the meaning of 42 U.S.C. §1983.

429.   At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes,

foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

430.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

431.   CFCE violated SURVIVOR's Constitutional rights as follows:

a.   It failed to request and/or obtain crucial records and documentation to ensure SURVIVOR's continuity of care and continued receipt of necessary care and services, including without limitation, the CBHA, birth certificates, chronological case notes, and abuse reports upon assuming case management responsibility for SURVIVOR's case;

b.   CFCE established and enforced customs, policies, and/or practices in which they failed to adhere to professional standards by not interviewing the critical participants in the dependency case, including but not limited to, the GAL, Abusive Parents, school employees, and any other relevant parties to establish a baseline of knowledge about SURVIVOR's well-being upon assuming responsibility for their care;

c.   As a direct result of these customs, policies, and/or practices, SURVIVOR was not enrolled in elementary school until three (3) months into the school year in reckless disregard of his educational needs and he continued to languish without recommended psychological therapies and treatment;

d.   CFCE established policies and customs that permitted foster children to remain in care far longer than the recommended time period required by section 39.001(1)(h), Florida Statutes, including allowing the SURVIVOR and his sister to remain in care for five (5) years while their mental health and educational conditions deteriorated.

e.     CFCE established and enforced customs, policies, and/or practices resulting in a standard of care that was based upon organizational measurements rather than client-centered outcomes, such that no one from CFCE was ensuring that case managers were actually ensuring that children's needs were being met and that they were in safe placements;

f.     CFCE established and enforced customs, policies, and/or practices resulting in the focus of performance being on achievement of administrative tasks and artificial productivity benchmarks rather than standardization of care, the quality of child welfare services being provided, and the safety of children in their care;

g.     CFCE established and enforced customs, policies, and/or practices which resulted in children regularly failing to receive necessary medical, dental, and psychological services, such as SURVIVOR;

h.     CFCE established and enforced customs, policies, and/or practices which resulted in supervisors regularly failing to conduct supervisory reviews or when such reviews were conducted, failing to actually provide guidance and direction to the case managers, such as occurred in this case;

i.     CFCE established and enforced customs, policies, and/or practices which resulted in case managers regularly failing to monitor children's educational progress to determine whether educational needs were being met and failing to meet those needs, such as occurred in this case;

j.     CFCE established and enforced customs, policies, and/or practices in which no one person was directly responsible for ensuring that each individual involved in a child's case shared and had access to all pertinent case-related information, including allegations of abuse, such as occurred in this case;

k.     CFCE established and enforced customs, policies, and/or practices in which cases were transferred from the foster care unit to the adoption unit, resulting in a new case manager and supervisor being assigned to the case, based solely upon the time a child was freed for adoption and with no regard to the current activities in the case which might necessitate continued involvement of the case manager most familiar with the case at the time;

l.     CFCE established and enforced customs, policies, and/or practices in which no internal staffings, meetings, or other case transfer reviews occurred between the foster care and adoption units prior to transfer of the case to new workers, such that the adoption unit has no baseline of the children's well-being or needs at the time the case is transferred other than reliance upon receiving a full and complete case file to review; and,

m.     CFCE established and enforced customs, policies, and/or practices resulting in regular failures of case managers and other responsible parties from ensuring that all relevant and required documentation was contained in the case file, including but not limited to, medical records, dental records, educational records, mental health and behavioral records, and abuse reports.

432.   CFCE took said actions knowing they were exposing children who were in State custody, including SURVIVOR, to a substantial risk of serious harm.

433.   Despite possessing the authority and means to remedy the unconstitutional treatment of SURVIVOR, CFCE was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR and other dependent children like him received all necessary treatment and services and were not harmed while in State custody.

434.   CFCE's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological

harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

435.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against CFCE for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

**COUNT VII - 42 U.S.C. §1983 CLAIM AGAINST LATEEF IBRAHIM**

436.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53, and 132-371 of the allegations above as if fully set forth herein.

437.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

438.   At all times relevant hereto, IBRAHIM, as the foster care case manager was acting under color of state law and was acting or purporting to act in the performance of his official duties.

439.   At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

440.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free

82

from unreasonable risk of harm.

441.  At all times material hereto, IBRAHIM was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

442.  At all times relevant hereto, IBRAHIM was obligated to know the content of SURVIVOR's case file and maintain same.

443.  IBRAHIM violated SURVIVOR's Constitutional and federal rights as follows:

a.    He deliberately failed to learn that the Abusive Parents changed SURVIVOR's school setting as a result of the 2006 abuse investigation and that SURVIVOR's were not only failing in school but missing an inordinate number of days of school without adequate excuse until the 2007 abuse investigation was brought to his attention;

b.    He deliberately disregarded a known substantial risk of serious harm once the facts of the 2007 abuse investigation were brought to his attention by taking no action whatsoever to inquire as to the reasons for SURVIVOR's poor school performance, unkempt conditions, excessive absences, and demonstrations of extreme fear of the Abusive Parents in order to ensure SURVIVOR was safe in his placement;

c.    Despite numerous professional recommendations for therapy, a history of sexual abuse, and new allegations of serious psychological and behavioral issues, he failed to seek and or obtain any evaluations or treatment for SURVIVOR in gross disregard of his health, safety, and well-being;

d.    He blatantly misrepresented to the Court and the CRP that SURVIVOR had been receiving therapy at some point in time, despite certain knowledge that no such therapy had been occurring given he would have been the individual responsible for referrals and

coordinating with the alleged provider;

   e. He either deliberately failed to learn the truth or outright assisted the Abusive Parents in perpetrating lies to the Court and the CRP regarding SURVIVOR's poor school performance and SURVIVOR's alleged tutoring in after care when there was in fact no tutoring in that program;

   f. He failed to consult with SURVIVOR's school regarding his performance and potentially needed services in direct contravention to the CRP orders to do so.  In fact, he never visited SURVIVOR's school or made contact with school personnel to monitor SURVIVOR's performance;

   g. He deliberately failed to learn or recklessly ignored that SURVIVOR would be retained in the first grade until the GAL brought that information to the Court's attention, and even after the psychoeducational evaluations revealed that SURVIVOR's failures did not correlate with their IQ or cognitive abilities, he failed to make further inquiries into the cause for said failures, knowing that there was a substantial risk the harm was a result of abuse and/or neglect by the Abusive Parents;

   h. He either deliberately disregarded repeated lies by the Abusive Parents about SURVIVOR doing well both at home and at school once he learned that information was patently false or he outright assisted the Abusive Parents in maintaining custody of SURVIVOR in reckless disregard of their safety, knowing they faced a substantial risk of harm if left in the Abusive Parents' care;

   i. He failed to make inquiries of the GAL or conduct further investigation into the veracity of the Abusive Parents' attacks on the GAL that only arose upon the GAL looking further into the 2007 abuse allegations, but rather sided with the Abusive Parents in their

claims with deliberate indifference to SURVIVOR's safety and well-being;

j.    He took no action to obtain treatment or individual therapy as recommended by Dr. Archer in June 2007, despite the serious diagnoses that SURVIVOR was suffering from depression and had thoughts of suicide;

k.    He recklessly disregarded the Abusive Parents efforts to ban the GAL from their home and from conducting required home visits and instead positively assisted them in their efforts to have the GAL removed from SURVIVOR's case;

l.    He not only deliberately disregarded the known substantial risk that SURVIVOR's deterioration in care and depression was a result of abuse and neglect in the Abusive Parents' home, but actually continued to vigorously advocate for the Abusive Parents as a good placement and an appropriate adoptive home;

m.    He failed to obtain court-ordered evaluations of SURVIVOR for months, making repeated excuses for his deliberate failures either in gross disregard of his needs or in a concerted effort to delay the evaluations long enough that the results might be positive by the time the evaluations were completed;

n.    As a result of his delays, the evaluations did not occur until six (6) months after being ordered by the court, which permitted the Abusive Parents enough time to ensure SURVIVOR's performance in school and behaviors began to improve in order to justify leaving SURVIVOR in the Abusive Parents' home and proceeding with adoption; and,

o.    He failed to ensure that necessary medical and dental care was provided at all times while SURVIVOR was in the custody of the State and was deliberately indifferent to his serious medical and/or psychological needs.

444.    IBRAHIM took said actions knowing they would deprive SURVIVOR of his

Constitutional and federal rights and expose him to a substantial risk of harm.

445.   Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, IBRAHIM was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR was safe in the Abusive Parents' home and that he received all necessary treatment and services.

446.   IBRAHIM 's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and  trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

447.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against IBRAHIM for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT VIII - 42 U.S.C. §1983 CLAIM AGAINST ANGELA WILLIAMS

448.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53 and 132-371 of the general allegations above as if fully set forth herein.

449.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

450.   At all times relevant hereto, WILLIAMS, as the foster care supervisor to

IBRAHIM was acting under color of state law and was acting or purporting to act in the performance of her official duties.

451. At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

452. At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

453. At all times material hereto, WILLIAMS was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

454. At all times relevant hereto, WILLIAMS was obligated to know the contents of SURVIVOR's case file and conduct monthly supervisory reviews with IBRAHIM, providing direction and guidance regarding necessary tasks, including without limitation, making necessary referrals for medical and psychological assessments and treatment, investigating the foster home when questions of SURVIVOR's safety arose, ensuring information provided to the Court, the CRP, and other relevant providers and evaluators was truthful and accurate, and any and all other necessary actions to ensure SURVIVOR's health, safety, and well-being while in care.

455. WILLIAMS violated SURVIVOR's Constitutional and federal rights as follows:

a. She permitted IBRAHIM 's activities, or lack thereof, on SURVIVOR's case to go unchecked and unsupervised, such that she deliberately failed to learn or recklessly disregarded the known substantial risk of harm SURVIVOR faced in the Abusive Parents' home;

b. She deliberately failed to learn that the Abusive Parents changed

SURVIVOR's school setting as a result of the 2006 abuse investigation and that SURVIVOR was not only failing in school but missing an inordinate number of days of school without adequate excuse;

       c.    She deliberately disregarded a known substantial risk of harm once the facts of the 2007 abuse investigation were brought to IBRAHIM 's attention by taking no action whatsoever to ensure that he inquired as to the reasons for SURVIVOR's poor school performance, unkempt conditions, excessive absences, and demonstrations of extreme fear of the Abusive Parents in order to ensure SURVIVOR was safe in his placement;

       d.    Despite numerous professional recommendations for therapy, a history of sexual abuse, and new allegations of serious psychological and behavioral issues, she failed to ensure that IBRAHIM sought and/or obtained any evaluations or treatment for SURVIVOR in gross disregard of his health, safety, and well-being;

       e.    She blatantly misrepresented to the Court and the CRP that SURVIVOR had been receiving therapy at some point in time, despite certain knowledge that no such therapy had been occurring given he would have been the individual responsible for referrals and coordinating with the alleged provider;

       f.    She either deliberately failed to learn the truth or outright assisted the Abusive Parents, through IBRAHIM, in perpetrating lies to the Court and the CRP regarding SURVIVOR's poor school performance and SURVIVOR's alleged tutoring in after care when there was in fact no tutoring in that program;

       g.    She failed to ensure that IBRAHIM consulted with SURVIVOR's school regarding their performance and potentially needed services in direct contravention to the CRP orders to do so, and failed to ensure that he ever visited SURVIVOR's school or made contact

with school personnel to monitor SURVIVOR's performance;

h.      She deliberately failed to learn or recklessly ignored that SURVIVOR would be retained in the first grade until the GAL brought that information to the Court's attention, and even after the psychoeducational evaluations revealed that SURVIVOR's failures did not correlate with his IQ or cognitive abilities, she failed to instruct IBRAHIM to make further inquiries into the cause for said failures, knowing that there was a substantial risk the harm was a result of abuse and/or neglect by the Abusive Parents;

i.      She either deliberately disregarded repeated lies by the Abusive Parents about SURVIVOR doing well both at home and at school once he learned that information was patently false or  outright assisted the Abusive Parents, through IBRAHIM, in maintaining custody of SURVIVOR in reckless disregard of their safety, knowing he faced a substantial risk of harm if left in the Abusive Parents' care;

j.      She failed to make inquiries of the GAL or conduct further investigation into the veracity of the Abusive Parents' attacks on the GAL that only arose upon the GAL looking further into the 2007 abuse allegations, but rather sided with the Abusive Parents in their claims with deliberate indifference to SURVIVOR's safety and well-being;

k.      She took no action to ensure that IBRAHIM obtained treatment or individual therapy as recommended by Dr. Archer in June 2007, despite the serious diagnoses that SURVIVOR was suffering from depression and had thoughts of suicide;

l.      She recklessly disregarded the Abusive Parents efforts to ban the GAL from their home and from conducting required home visits;

m.      She not only deliberately disregarded or deliberately failed to learn the known substantial risk that SURVIVOR's deterioration in care and depression was a result of

abuse and neglect in the Abusive Parents' home, but actually permitted IBRAHIM to continue to vigorously advocate for the Abusive Parents as a good placement and an appropriate adoptive home;

n.     She failed to ensure that IBRAHIM obtained court-ordered evaluations without delay and permitted the orders to be violated for months, while IBRAHIM made repeated excuses for his deliberate failures either in gross disregard of SURVIVOR's needs or in a concerted effort to delay the evaluations long enough that the results might be positive by the time the evaluations were completed;

o.     As a result of these delays, the evaluations did not occur until six (6) months after being ordered by the court, which permitted the Abusive Parents enough time to ensure SURVIVOR's performance in school and behaviors began to improve in order to justify leaving SURVIVOR in the Abusive Parents' home and proceeding with adoption; and,

p.     She failed to ensure that necessary medical and dental were provided at all times while SURVIVOR was in the custody of the State and was deliberately indifferent to his serious medical and/or psychological needs;

456.    WILLIAMS took said actions knowing they would expose him to a substantial risk of serious harm.

457.    Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, WILLIAMS was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR was safe in the Abusive Parents' home and that he received all necessary treatment and services.

458.    WILLIAMS' deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm,

psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

459.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against WILLIAMS for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

## COUNT IX - 42 U.S.C. §1983 CLAIM AGAINST ROBERTA THEOC

460.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53, 132-371 of the allegations above as if fully set forth herein.

461.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

462.   At all times relevant hereto, THEOC, as both a foster care case manager and adoption case manager was acting under color of state law and was acting or purporting to act in the performance of her official duties.

463.   At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

464.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free

from unreasonable risk of harm.

465.   At all times material hereto, THEOC was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

466.   At all times relevant hereto, THEOC was obligated to know the content of SURVIVOR's case file and maintain same.

467.   THEOC violated SURVIVOR's Constitutional and federal rights as follows:

a.   She failed to ensure that the Abusive Parents had the necessary birth certificates with which to register SURVIVOR for school, resulting in SURVIVOR not entering kindergarten until three (3) months into the school year in gross disregard for his educational needs;

b.   She failed to ensure that Dr. Archer had all documentation and case history upon which to base her placement evaluation in September 2005, which resulted in findings and recommendations that were based upon false information provided by the Abusive Parents;

c.   She deliberately disregarded the false information and failed to ensure it was corrected and that Dr. Archer's conclusions were valid, resulting in SURVIVOR being denied his right to be placed with relatives out-of-state and remaining in the Abusive Parents' home;

d.   She falsely informed the Court or otherwise failed to follow through on her claims that Plain SURVIVOR tiff was referred for a another mental health assessment to get play therapy in August 2005;

e.   She recklessly disregarded Dr. Archer's findings that SURVIVOR presented with attachment difficulties, appeared to have some minor speech problems, and that

92

Victim had trouble providing a logical and coherent account of events and deliberately failed to seek and/or obtain services or treatment to address these issues with deliberate indifference to SURVIVOR 's health and well-being;

    f.  Despite yet another recommendation for play therapy and psycho-sexual evaluations of SURVIVOR in December 2005, she failed to make any of the necessary referrals or otherwise ensure SURVIVOR received those services in reckless disregard of his emotional and psychological needs;

    g.  When she was reassigned to SURVIVOR's case as adoption case manager in November 2007, she was aware of the history and ongoing inquiries into serious abuse and neglect allegations, numerous recommendations for therapy and treatment, and that SURVIVOR had been retained in the first grade, and despite this knowledge took no action to correct the failures of IBRAHIM in securing SURVIVOR necessary services;

    h.  In fact, despite this knowledge, she failed to take any action or request additional investigation after attempting several times to conduct her initial home visit with the Abusive Parents with no success, discovering the contact number they had was disconnected, and otherwise being unable to visit them for well over one month after being assigned to the case;

    i.  She falsely represented to the CRP in January 2008 that SURVIVOR did not need therapy in direct contravention of all prior and recent professional recommendations, including Dr. Archer's report just six (6) months prior that SURVIVOR was suffering from depression with deliberate indifference to SURVIVOR's serious psychological needs;

    j.  She failed to make inquiries of the GAL or conduct further investigation into the veracity of the Abusive Parents' attacks on the GAL, including their claims that the GAL

committed perjury, but rather advocated on behalf of the Abusive Parents that the GAL was interfering with adoption of SURVIVOR with deliberate indifference to SURVIVOR's safety and well-being;

k.   She continued IBRAHIM's failure to obtain the court-ordered evaluations of SURVIVOR for months, such that the evaluations did not occur until six (6) months after being ordered by the court, which permitted the Abusive Parents enough time to ensure SURVIVOR's performance in school and behaviors began to improve in order to justify proceeding with adoption;

l.   She again deliberately failed to provide Dr. Archer with any of the relevant records or information regarding SURVIVOR being retained in first grade, excessive absences, extreme fear, and all of the other abuse allegations made in 2007, such that Dr. Archer's 2008 recommendation to proceed with the adoption by the Abusive Parents was wholly without merit;

m.   Despite knowing that Dr. Archer's evaluation contained crucial false and inaccurate information, she took no action to correct the contents of the report or otherwise consult with Dr. Archer to ensure that her recommendations were valid and either deliberately ignored this fact or affirmatively assisted the Abusive Parents by ensuring the report would have a favorable outcome with deliberate indifference to SURVIVOR's safety and well-being;

n.   She reported to the Court that she had a glowing report by Dr. Archer recommending the adoption despite knowing that the report was inaccurate and likely reached an incorrect conclusion as a result in reckless disregard for SURVIVOR's safety and well-being;

o.   She either deliberately ignored the fact that the Abusive Parents suddenly decided not to press the issue of the GAL committing perjury, despite having set a hearing on the matter, as soon as Dr. Archer's report advised to proceed with the adoption or she affirmatively

94

colluded with the Abusive Parents in advance of the hearing to no longer pursue the attack on the GAL, because Dr. Archer's report would ensure the adoption would move forward;

p.     She recklessly disregarded obvious and continued lies by the Abusive Parents with regard to the GAL, completion of their adoption packet, obtaining updated physicals for the children, and the alleged basis for their delays and proceeded with finalizing Plaintiff's adoption with deliberate indifference to safety and permanency;

q.     She deliberately ignored the clear warning signs of a substantial risk of harm when the Abusive Parents continuously delayed completing their adoption tasks with no valid or justifiable cause for an excessive seven (7) months delay despite having spent the last several years pushing to get the adoption done and proceeded with finalization with deliberate indifference to SURVIVOR's safety and permanency; and,

r.     She failed to ensure that necessary medical and dental were provided at all times while SURVIVOR was in the custody of the State and was deliberately indifferent to his serious medical and/or psychological needs.

468.   THEOC took said actions knowing they would expose him to a substantial risk of serious harm.

469.   Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, THEOC was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR was safe in the Abusive Parents' home and that he received all necessary treatment and services.

470.   THEOC's deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other

95

reasonably foreseeable damages.

471.   SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against THEOC for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.

**COUNT X - 42 U.S.C. §1983 CLAIM AGAINST YVES FRANCOIS**

472.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53, 132-371 of the allegations above as if fully set forth herein.

473.   This action arises under and is brought pursuant to 42 U.S.C. §1983 to remedy the deprivation, under color of state law, of SURVIVOR's guaranteed rights under the Fourteenth Amendment of the United States Constitution and applicable federal laws, including without limitation, the Adoptions and Safe Families Act.

474.   At all times relevant hereto, FRANCOIS, as the adoption supervisor to THEOC was acting under color of state law and was acting or purporting to act in the performance of her official duties.

475.   At all times material hereto, pursuant to § 409.1671(1)(f)(1), Florida Statutes, foster care is a public function traditionally within the exclusive prerogative of the State of Florida.

476.   At all relevant times, it was clearly established that children in the physical custody of the state foster care system had the Constitutional and federal right to be safe and free from unreasonable risk of harm.

477.   At all times material hereto, FRANCOIS was deliberately indifferent and/or acted with reckless disregard to SURVIVOR's health, safety, and welfare and Constitutional and federal rights.

478.   At all times relevant hereto, FRANCOIS was obligated to know the contents of SURVIVOR's case file and conduct monthly supervisory reviews with THEOC, providing direction and guidance regarding necessary tasks, including without limitation, making necessary referrals for medical and psychological assessments and treatment, investigating the foster home when questions of SURVIVOR's safety arose, ensuring information provided to the Court, the CRP, and other relevant providers and evaluators was truthful and accurate, ensuring adoption tasks were completed in a timely manner and that the adoption was appropriate, and any and all other necessary actions to ensure SURVIVOR's health, safety, and well-being while in care.

479.   FRANCOIS violated SURVIVOR's Constitutional and federal rights as follows:

a.    When SURVIVOR's case was transferred to the adoption unit in November 2007, she was aware of the history and ongoing inquiries into serious abuse and neglect allegations, numerous recommendations for therapy and treatment, and that SURVIVOR had been retained in the first grade, and despite this knowledge took no action to correct or ensure that THEOC corrected the failures of IBRAHIM in securing SURVIVOR's necessary services;

b.    In fact, despite this knowledge, she failed to request additional investigation after THEOC attempted several times to conduct her initial home visit with the Abusive Parents with no success, discovering the contact number they had was disconnected, and otherwise being unable to visit them for well over one month after being assigned to the case;

c.      She falsely represented and/or permitted THEOC to falsely represent to the CRP in January 2008 that SURVIVOR did not need therapy in direct contravention of all prior and recent professional recommendations, including Dr. Archer's report just six (6) months prior that SURVIVOR was suffering from depression with deliberate indifference to SURVIVOR's serious psychological needs;

d.      She failed to make inquiries and/or direct THEOC to make such inquiries of the GAL or conduct further investigation into the veracity of the Abusive Parents' attacks on the GAL, including their claims that the GAL committed perjury, but rather permitted THEOC to advocate on behalf of the Abusive Parents that the GAL was interfering with adoption of SURVIVOR with deliberate indifference to SURVIVOR's safety and well-being;

e.      She failed to ensure that THEOC did not continue IBRAHIM's failure to obtain the court-ordered evaluations of SURVIVOR for months, such that the evaluations did not occur until six (6) months after being ordered by the court, which permitted the Abusive Parents enough time to ensure SURVIVOR's performance in school and behaviors began to improve in order to justify proceeding with adoption;

f.      She deliberately failed to ensure that THEOC provided Dr. Archer with any of the relevant records or information regarding SURVIVOR being retained in first grade, excessive absences, extreme fear, and all of the other abuse allegations made in 2007, such that Dr. Archer's 2008 recommendation to proceed with the adoption by the Abusive Parents was wholly without merit;

g.      Despite knowing that Dr. Archer's evaluation contained crucial false and inaccurate information, she took no action and failed to direct THEOC to take such action to correct the contents of the report or otherwise consult with Dr. Archer to ensure that her

recommendations were valid and either deliberately ignored this fact or affirmatively assisted the Abusive Parents by ensuring the report would have a favorable outcome with deliberate indifference to SURVIVOR's safety and well-being;

       h.    She permitted THEOC to report to the Court that she had a glowing report by Dr. Archer recommending the adoption despite knowing that the report was inaccurate and likely reached an incorrect conclusion as a result in reckless disregard for SURVIVOR's safety and well-being;

       i.    She either deliberately ignored the fact that the Abusive Parents suddenly decided not to press the issue of the GAL committing perjury, despite having set a hearing on the matter, as soon as Dr. Archer's report advised to proceed with the adoption or she permitted THEOC to affirmatively colluded with the Abusive Parents in advance of the hearing to no longer pursue the attack on the GAL, because Dr. Archer's report would ensure the adoption would move forward;

       j.    She recklessly disregarded obvious and continued lies by the Abusive Parents with regard to the GAL, completion of their adoption packet, obtaining updated physicals for the children, and the alleged basis for their delays and proceeded with finalizing SURVIVOR's adoption with deliberate indifference to safety and permanency;

       k.    She deliberately ignored the clear warning signs of a substantial risk of harm when the Abusive Parents continuously delayed completing their adoption tasks with no valid or justifiable cause for an excessive seven (7) months delay despite having spent the last several years pushing to get the adoption done and proceeded with finalization with deliberate indifference to SURVIVOR's safety and permanency; and,

       l.    She failed to ensure that necessary medical and dental care was provided at

all times while SURVIVOR was in the custody of the State and was deliberately indifferent to his serious medical and/or psychological needs.

480. FRANCOIS took said actions knowing they would expose SURVIVOR to a substantial risk of harm.

481. Despite having the authority and means to remedy the unconstitutional treatment of SURVIVOR, FRANCOIS was deliberately indifferent and/or recklessly failed to take immediate action to ensure that SURVIVOR was safe in the Abusive Parents' home and that he received all necessary treatment and services.

482. FRANCOIS' deliberate indifference and/or recklessness was a substantial factor, and a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages.

483. SURVIVOR is obligated to the undersigned firm for payment of attorney's fees and costs, and is entitled to recover reasonable attorney's fees and costs pursuant to the provisions of 42 U.S.C. §1988.

WHEREFORE, Plaintiff SURVIVOR prays that this Honorable Court enter a judgment in favor of SURVIVOR against FRANCOIS for all recoverable damages, attorney's fees and costs, and all such other lawful damages and relief as the Court may deem appropriate and proper.


## COUNT XI - NEGLIGENCE CLAIM AGAINST OUR KIDS, INC.

484. Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53, 132-371 of the allegations above as if fully set forth herein.

485. OUR KIDS, through its agents and/or employees, owed SURVIVOR the

following non-delegable duties:

a.     To provide continuity of care for SURVIVOR from his entry into foster care until his exit pursuant to § 409.1671(1)(e)(2), Florida Statutes;

b.     To be accountable for meeting the outcomes and performance standards relating to the child protective services provided to SURVIVOR pursuant to § 409.1671(1)(e)(4), Florida Statutes;

c.     To use reasonable care in the supervision and oversight of SURVIVOR to ensure his health, welfare, and safety needs were met, including as expressly contemplated, affirmed and delineated in Chapter 39 of the Florida Statutes, the Florida Administrative Code and other written policies and procedures issued by DCF and OUR KIDS;

d.     To ensure SURVIVOR's individual dignity, liberty, pursuit of happiness, and the protection of his federally guaranteed civil and other legal rights pursuant to § 39.4085(2), Florida Statutes;

e.     To ensure that personnel providing services to SURVIVOR be sufficiently qualified, experienced and diligent to meet her needs while he was in State custody pursuant to § 39.4085(4), Florida Statutes;

f.     To ensure SURVIVOR received a full risk, health, educational, medical, and psychological screening, and assessment and testing upon adjudication into foster care pursuant to § 39.4085(6), Florida Statutes;

g.     To ensure SURVIVOR's safety by providing necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment as soon as practicable after identification of the need for such services by the screening and assessment process pursuant to § 39.4085(6), Florida Statutes;

    h.    To ensure that significant events in SURVIVOR's life were recorded in a format that could be used by subsequent caregivers and professionals pursuant to Rule 10M-6.131(10) of the Florida Administrative Code;

    i.    To maintain, review, and provide the foster parent with a Child Resource Record and a complete record of SURVIVOR's health records pursuant to Rules 65C-28.005 and 10M-6.131(10) of the Florida Administrative Code;

486.   OUR KIDS, through its agents and/or employees, breached said non-discretionary, non-delegable duties.

487.   As a direct and proximate cause of the aforementioned breach, SURVIVOR was damaged by not receiving adequate care and services to address his safety, medical, dental, psychological, and educational needs while in the care and custody of the State; by failing to arrange for therapeutic services that would have afforded SURVIVOR the opportunity to disclose the abuse and neglect he was suffering in the Abusive Parents' home; by failing to maintain appropriate records in the case file and Child Resource Record that would have resulted in valid professional recommendations regarding placement; and by suffering and continuing to suffer deterioration while in the care of the State from his wrongful adoption and harm from post-adoption neglect and abuse.

488.   Such acts were a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damages. These losses are either permanent or continuing in nature and SURVIVOR will suffer such losses in the future.

489.   OUR KIDS' committed these breaches with willful and wanton disregard of SURVIVOR's safety, health, and well-being.  Accordingly, pursuant to section 409.1671(1)(i),

Florida Statutes, the statutory limits on liability are inapplicable.

WHEREFORE, Plaintiff SURVIVOR demands judgment against Defendant OUR KIDS for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

## COUNT XII - NEGLIGENCE CLAIM AGAINST
## THE CENTER FOR FAMILY AND CHILD ENRICHMENT

490.   Plaintiff SURVIVOR reavers and realleges the allegations of paragraphs 1-15, 31-53, 132-371 of the allegations above as if fully set forth herein.

491.   CFCE, through its agents and/or employees, owed SURVIVOR the following non-delegable duties:

a.   To provide continuity of care for SURVIVOR from his entry into foster care until his exit pursuant to § 409.1671(1)(e)(2), Florida Statutes;

b.   To be accountable for meeting the outcomes and performance standards relating to the child protective services provided to SURVIVOR pursuant to § 409.1671(1)(e)(4), Florida Statutes;

c.   To use reasonable care in the supervision and oversight of SURVIVOR to ensure their health, welfare, and safety needs were met, including as expressly contemplated, affirmed and delineated in Chapter 39 of the Florida Statutes, the Florida Administrative Code and other written policies and procedures issued by DCF, OUR KIDS, and CFCE;

d.   To ensure SURVIVOR's individual dignity, liberty, pursuit of happiness, and the protection of his federally guaranteed civil and other legal rights pursuant to § 39.4085(2), Florida Statutes;

e.   To ensure that personnel providing services to SURVIVOR be sufficiently qualified, experienced and diligent to meet his needs while he was in State custody pursuant to §

103

39.4085(4), Florida Statutes;

      f.    To ensure SURVIVOR received a full risk, health, educational, medical, and psychological screening, and assessment and testing upon adjudication into foster care pursuant to § 39.4085(6), Florida Statutes;

      g.    To ensure SURVIVOR's safety by providing necessary medical, emotional, psychological, psychiatric, and educational evaluations and treatment as soon as practicable after identification of the need for such services by the screening and assessment process pursuant to § 39.4085(6), Florida Statutes;

      h.    To ensure that significant events in SURVIVOR's life was recorded in a format that could be used by subsequent caregivers and professionals pursuant to Rule 10M-6.131(10) of the Florida Administrative Code;

      i.    To maintain, review, and provide the foster parent with a Child Resource Record and a complete record of SURVIVOR's health records pursuant to Rules 65C-28.005 and 10M-6.131(10) of the Florida Administrative Code;

492. CFCE, through its agents and/or employees, breached said non-discretionary, non-delegable duties.

493. As a direct and proximate cause of the aforementioned breach, SURVIVOR was damaged by not receiving adequate care and services to address his medical, dental, psychological, and educational needs while in the care and custody of the State; by failing to arrange for therapeutic services that would have afforded SURVIVOR the opportunity to disclose the abuse and neglect he was suffering in the Abusive Parents' home; by failing to maintain appropriate records in the case file and Child Resource Record that would have resulted in valid professional recommendations regarding placement; and by suffering and continuing to

suffer deterioration while in the care of the State and post-adoption.

494.   Such acts were a direct and proximate cause of SURVIVOR suffering physical harm, medical harm, psychological harm and trauma, pain and suffering, deterioration, wrongful adoption and other reasonably foreseeable damage. These losses are either permanent or continuing in nature and SURVIVOR will suffer such losses in the future.

495. CFCE committed these breaches with willful and wanton disregard of SURVIVOR 's safety, health, and well-being.  Accordingly, pursuant to section 409.1671(1)(i), Florida Statutes, the statutory limits on liability are inapplicable.

WHEREFORE, Plaintiff SURVIVOR demands judgment against Defendant CFCE for compensatory damages, costs, and all other such relief as the Court may deem just and proper.

### Demand for Jury Trial

Plaintiff demands the right to trial by jury of such claims and issues as are so triable as a matter of right.

Dated this 23rd day of December 2011          Respectfully submitted,

TERESITA CHAVEZ PEDROSA, P.A.          COLODNY, FASS, TALENFELD, KARLINSKY & ABATE, P.A.

**TERESITA CHAVEZ PEDROSA, ESQ.**
Fla. Bar. No.: 132527
7810 NW 185th St
Hialeah, Florida 33015
Email address: teresitachavezpedrosa@yahoo.com
Telephone: (786) 417-0361
Co-counsels for Plaintiff

**HOWARD M. TALENFELD, ESQ.**
Fla. Bar No.: 312398
Email address: htalefeld@cftlaw.com
**JOEL S. FASS, ESQ.**
Fla. Bar No.: 213233
**STACIE J. SCHMERLING, ESQ.**
Fla. Bar No.: 83862
One Financial Plaza, 23rd Floor
100 SE 3rd Avenue
Ft. Lauderdale, Florida 33394
Telephone: (954) 492-4010
Co-counsels for Plaintiff